MIDDLESEX CONCRETE PRODUCTS AND EXCAVATING CORPORATION, A NEW JERSEY CORPORATION, *ET AL.*, PLAINTIFFS-APPELLANTS, v. THE CARTERET INDUSTRIAL ASSOCIATION, A NEW JERSEY CORPORATION, *ET AL.*, DEFENDANTS-RESPONDENTS.

Argued April 2, 1962—Decided June 4, 1962.

*Mr. Melvin J. Koestler* argued the cause for plaintiffs-appellants (*Messrs. Koestler & Koestler,* attorneys).

*Mr. Charles J. Milton, Jr.,* argued the cause for defendants-respondents (*Messrs. Milton & Keane,* attorneys; *Mr. Charles J. Milton* and *Allan H. Klinger,* on the brief).

The opinion of the court was delivered by

HANEMAN, J.   Plaintiffs filed suit seeking recovery for an alleged conspiracy by defendants to commit tortious interference with their contractual rights and economic relations.

One of the defendants named in the complaint, Malcolm Baxter, was not served and is therefore not before the court.   A second defendant, Philip Streander, filed an answer setting up privilege as a defense and moved for a summary judgment.   The motion was granted and affirmed on appeal.   *Middlesex Concrete, etc. v. Carteret Industrial Ass'n.,* 68 *N. J. Super.* 85 (*App. Div.* 1961).   No appeal

from that determination has been taken. The remaining defendants having filed answers, also moved for judgment prior to trial, either (1) for dismissal in that the complaint failed to state a claim upon which relief could be granted, or (2) for summary judgment in that there palpably was no issue as to any material fact and defendants were entitled to a judgment as a matter of law. Argument thereon was deferred pending appeal on the Streander motion. After the decision in that case the motion of the remaining defendants for judgment was granted upon consideration by the trial court of the pleadings, affidavits and depositions. (Reference hereafter to defendants shall include only these remaining defendants.) Plaintiffs appealed to the Appellate Division and this court certified the same before argument there, upon its own motion. R. R. 1:10–1(a).

The facts gleaned from the above sources, viewed in the light most favorable to plaintiffs, exhibit that:

Plaintiffs, Middlesex Concrete Products and Excavating Corp. (Middlesex) and Abraham and Martin Neiss are, respectively, a New Jersey corporation engaged in the general contracting business and the sole owners of its stock.

Defendant, The Carteret Industrial Association (CIA) is a corporation not for pecuniary profit, whose members are the nine corporate defendants who operate large industrial plants in the Borough of Carteret (Carteret). The total value of the holdings of the corporations as assessed by Carteret is $7,622,195 which represents 56% of the total assessed value of the ratables in the municipality. Defendants Harry A. Hennessey and Robert T. Walsh are, respectively, the secretary of CIA, from 1919 to 1945 and from January 1, 1957 to date, and the secretary of CIA from 1945 through 1956. Defendant Russell E. Watson, a member of the bar of this State, was counsel, agent and representative of CIA and subsequently special counsel for Carteret.

Sometime in 1942 the Interstate Sanitation Commission directed Carteret to take steps to prevent discharge of

untreated sewage into the bordering coastal waters. Eight years and some court proceedings later, the municipal officials concluded that a sewage system, treatment and disposal plant would have to be constructed. They retained an engineer, Louis P. Booz, to prepare plans and specifications for the work and in the latter part of 1950 he supplied Carteret with a cost estimate for the entire project in the amount of $1,140,000.

Walsh, as secretary of CIA, was in constant contact with the Mayor of Carteret concerning the sewer project from November 21, 1950, at which time he had received a copy of the engineer's cost estimate. Walsh objected to the proposed improvement during a meeting of the governing body at which was adopted the ordinance providing $1,140,000 as financing for the project. Objection was upon the ground that a more economical method of sewage disposal would be a contract for such services with an adjoining municipality with established facilities.

Several days before August 16, 1951, the date advertised for the opening of bids on the construction work, Booz filed a revised estimate in the amount of $2,310,000, which estimate was furnished by Carteret to Walsh. Two bids were received, that of Middlesex in the amount of $2,224,232.50 and that of Horn Construction Company in the amount of $2,987,568. The mayor, being concerned at the difference of $750,000 between the bids, requested Walsh to check the responsibility of both bidders and to analyze the bid of Middlesex. Walsh reported that the bidders were legitimate contractors and that a civil engineer employed by one of the corporate defendants who had examined the unit bid prices of Middlesex stated that the bid was very reasonable and recommended the award of the contract to Middlesex.

After the award of the contract to Middlesex, CIA requested and was granted permission to employ an independent inspector at its own cost to check the progress of the work. Such inspector was thereafter employed.

The contract provided, *inter alia*, that Middlesex should be paid in monthly installments to the extent of 90% of the work actually completed and certified by the borough engineer as having been completed. The balance of 10% was to be retained until the engineer certified that the entire job had been completely performed, whereupon 5% was to be paid within thirty days and 5% one year thereafter. Any appeal from the determination of the engineer was subject to an arbitrator's binding judgment.

Middlesex undertook the work required by the contract and monthly estimates were made and paid as the work progressed, up to and including December 1952. These partial payment estimates amounted to $1,872,254.72. During this period disputes had arisen between Middlesex and Booz as to his claimed undercertification and as to damages allegedly sustained by Middlesex. On January 9, 1953 Middlesex submitted, at the borough's request, a written demand which listed additional claims totaling $1,190,885.59, plus an indeterminate amount arising out of a quantity of pipe costing $132,110. Middlesex also demanded $250,000 to complete the sanitary sewer work under the contract and in excess of $251,447.50 if it were to complete a storm-sewer drain called for under the contract. When added to the sums already certified this would have amounted to a contract cost in excess of $3,500,000.

On May 14, 1953 a conference was held in the office of the mayor of the borough to discuss the status of the contract and the claims of Middlesex. Attending this meeting were representatives of Carteret, Middlesex and CIA, including Russell E. Watson, special counsel for CIA. It was at this meeting that plaintiffs allege defendants first interfered.

At this meeting plaintiffs first demanded payment of the amount due them for completed work already certified by the borough engineer. They assert Watson instructed the borough officials at that time that no further payments should be made to Middlesex until they had negotiated a

settlement of all claims for extras, delays and damages. The alleged result of this suggested course of conduct, adopted by Carteret, was to put financial pressure upon Middlesex in order to coerce it to settle its claims cheaply or to abandon them and to desist from forcing submission to arbitration as provided by the contract.

Middlesex and the borough officials continued to confer thereafter and attempted to arrive at a settlement.

During the course of these negotiations there was a meeting on July 13, 1953 at which, according to information received by Walsh, some councilmen had tentatively agreed to compromise the Middlesex claims for $1,000,000. Reacting to this information, Watson, as counsel for CIA, addressed a letter under date of July 15, 1953 to the mayor and council of Carteret. The letter reads in part:

"We have just been informed that the Council is now considering seriously a proposal of the Middlesex Corporation that the Borough pay to it the sum of $1,000,000.00 in settlement of its claim for extras and damages.

We respectfully urge that this proposal be rejected and that the Middlesex Corporation be required to establish its claims by legal action. We believe that the Middlesex Corporation would be unable to prove by legal evidence lawful claims for $1,000,000.00 or any substantial part thereof.

This opinion rests upon the following reasons:

The Prosecutor of Middlesex County is investigating these claims for extras and damages. We are informed that this investigation is nearing completion but that the case has not yet been presented to the grand jury for appropriate action. It is, of course, impossible for any one to predict what action the grand jury may take. However, it is perfectly plain that if wrongdoing be revealed by the grand jury investigation and should an indictment be returned and if payments have been made by the Borough Council, the members of the Council might find themselves personally liable for any loss which the Borough might suffer.

Certain features of this transaction, which are the basis of this letter, deserve particular mention. Complete investigation may disclose others.

The Borough Engineers estimated about November 22, 1950 that the entire project would cost $1,200,000.00. On or about July 15, 1951 their estimate was revised upward to approximately $2,200,000.00. On or about August 16, 1951, the Middlesex Corpora-

tion submitted the lowest bid of $2,244,232.50 on the main contract and this contract was awarded to it. The next lowest bidder on the main contract was Horn Construction Company which bid $2,987,568.00, $743,335.50 higher than the bid of the Middlesex Corporation. About January 9, 1953, the Middlesex Corporation submitted a claim for extra compensation and damages amounting to $1,190,855.59. You are considering the settlement of this claim for $1,000,000.00, as we are informed.

The constant upward revision of the estimated construction costs by very substantial amounts from time to time is startling in itself and demands a satisfactory explanation by the Middlesex Corporation and the Borough Engineers. We have met several times informally with Mayor Bareford and members of the Council, with the Middlesex Corporation and with the Engineers and no satisfactory explanation was offered of these extraordinary increases in anticipated construction costs.

We direct your attention to three important items of the contract which, in our opinion, are evidential of unbalanced bidding prejudicial to the Borough: * * *"

There followed information showing that Booz allowed extra compensation totalling five times his original estimates on construction of an outfall sewer, that certain tunneling was almost double his estimate and that he recommended use of piping in a storm sewer which would have given Middlesex more than three times its bid unit price. The letter stated that the facts gave indications that Booz and Middlesex were aware in advance of bidding that large claims for extras would be involved. Accordingly, the letter urged that no compromise of claim be accepted and that Middlesex be required to prove its claims in court. Also included was a request that CIA be permitted an opportunity to confer with the Carteret officials before any action on the settlement was taken.

On July 16, 1953 the mayor called a meeting which was attended by the officials of the borough and CIA representatives, Watson and Walsh representing CIA. Watson read the above letter and stated that the proposed $1,000,000 settlement figure was excessive and that any councilman voting in favor of it could incur personal liability.

This letter, plaintiffs contend, directly and impliedly accused Middlesex and Booz with collusion, fraud and wrongdoing, which accusation was made without justification and with malicious intent, and threatened the municipal officials with possible personal liability if they agreed to a compromise settlement. Plaintiffs further assert that defendants' actions caused failure of a settlement which was close to consummation and the refusal to make any further payments to Middlesex and that Middlesex was thus eventually forced to abandon the arbitration proceedings and resort to the courts for relief.

On July 20, 1953 Middlesex filed suit against Carteret and Booz in an endeavor to collect on its claims. The complaint sought recovery from the municipality of a total of $1,800,000. Carteret filed an answer alleging fraud and collusion between Middlesex and Booz, the engineer, as well as defective performance of work and breach of warranty by Middlesex. Carteret also cross-claimed against the engineer for overcertifications, overpayments, negligence in planning and supervising the work and reimbursement for monies which it might be required to pay Middlesex arising out of the engineer's negligence. Middlesex moved for and was granted a summary judgment by consent for $343,842.66, being the amount of five work certifications already made but unpaid. The balance of the claims was contested by Carteret. After six years of litigation and 121 actual trial days by a judge without a jury, Middlesex received a judgment for $431,291.91 which included interest in the amount of $118,481.34. It becomes apparent, therefore, that Middlesex recovered on its basic claim of $1,800,000, approximately $650,000. Carteret's counterclaim was denied, the court finding that the allegations of fraud and collusion by and between Middlesex and Booz were unfounded and unproved. Judgment was entered in favor of Booz on both the complaint and cross-claim.

It was subsequent to the termination of that action that the matter now under appeal was instituted.

Plaintiffs argue that the trial court erred in that (1) the complaint states a claim upon which relief can be granted; (2) the defendants are not insulated against suit by reason of a privilege arising from their status as taxpayers; (3) the means employed and the object sought by defendants are not legally justified; (4) the existence of actual malice robs defendants of the benefits of any privilege that might exist. Defendants dispute these contentions.

Plaintiffs admit that the gravamen of their charge is not the alleged conspiracy. The essence of an action such as here brought is not the conspiracy but rather the underlying wrong and the resulting damage caused thereby, since a conspiracy cannot be made the subject of a civil action unless something has been done which, absent the conspiracy, would give a right of action. *Earl v. Winne,* 14 *N. J.* 119 (1953); *Louis Kamm, Inc. v. Flink,* 113 *N. J. L.* 582 (*E. & A.* 1934); *Kurtz v. Oremland,* 33 *N. J. Super.* 443 (*Ch. Div.* 1955), affirmed on opinion below, 16 *N. J.* 454 (1954). The wrong here done to plaintiffs allegedly consisted in defendants' malicious interference with the contractual rights and business or economic relations of Middlesex with Carteret. The law is well settled that unjustifiable interference with either is an actionable tort. *C. B. Snyder Realty Co. v. Nat. Newark, etc. Banking Co.,* 14 *N. J.* 146 (1953); *Louis Schlesinger Co. v. Rice,* 4 *N. J.* 169 (1950); *Louis Kamm, Inc. v. Flink, supra; Kurtz v. Oremland, supra; Mayflower Industries v. Thor Corp.,* 15 *N. J. Super.* 337 (*Ch. Div.* 1951), affirmed on opinion below, 9 *N. J.* 605 (1952). The *allegata* of the instant complaint having set out such a factual theme, it appears patent that so much of defendants' motion as sought a dismissal of the complaint as being insufficient in law must fail.

This is not, however, dispositive of the appeal. Defendants combined with their motion for dismissal a motion for summary judgment. No material fact as exhibited by the pleadings, affidavits and depositions is challenged. Of the

several bases advanced by defendants for judgment we need consider only that which asserts that their acts, by virtue of their status as taxpayers of the borough, were privileged and hence that their conduct was justified. Justification connotes a just and lawful excuse and negates malice, *Louis Kamm, Inc. v. Flink, supra, p.* 588, and, predictably, is the most common affirmative defense to an action for malicious interference. Such justification must be found to emanate from the exercise of a right equal to or superior to that of the plaintiff or from the pursuit of some lawful interest or purpose. *Louis Schlesinger Co. v. Rice, supra; Louis Kamm, Inc. v. Flink, supra.* It has been suggested that rather than to express such a defense in terms of justification it might be more accurately stated to be a matter of privilege, *i. e.,* the defendant may show that the interference is privileged by reason of the interests furthered by his conduct. *Prosser, Torts* 735 (*2d ed.* 1955). See also *Restatement, Torts,* §§ 766, 777 (1939).

▇ Approaching the problem in this case from either viewpoint, however, it is essential in determining the availability of justification or privilege as a defense to assay the relationship of the parties *inter sese* within the social and factual context presented, as well as to weigh the relative merits of the rights and advantages affected by the alleged tortious conduct. See *Prosser, supra,* 735–738, *Restatement, supra,* § 767, 1 *Harper & James, The Law of Torts,* § 6.12 (1956).

The fact that the interference complained of here is not so much with the formation or performance of the contract itself as with the prospective economic advantage made possible in the first instance by the contract provisions governing "extras," requires no special approach to the problem of justification or privilege. Interference with probable economic expectancies presents special difficulties only insofar as proof that they would have been realized is concerned. We assume, for purposes of adjudging the propriety of the summary judg-

ment now under appeal, that realization of those expectancies can be proven.

It is important in considering the relations of the parties *inter sese* to note that none of the defendants were competitors of Middlesex. All defendants were either taxpayers or representatives of taxpayers of Carteret. As such all had a direct interest in the expenditure of public monies flowing to Middlesex, for such expenditures would eventually have been reflected in the taxes borne by them. In the case of the corporate defendants this interest was substantial indeed.

From the above capsule analysis it becomes clear that if defendants' actions are to be protected it must be by virtue of their exercise of rights to protect their own interests as taxpayers or the public interest of the community.

■ Protection of the public interest has been recognized by the text writers as affording privilege to acts of interference. *Prosser, supra, p.* 749; *Harper & James, supra,* § 6.12; *Restatement, supra,* § 767, comment clause (d). We are constrained to agree with the logic of that view.

■ Examination of the circumstances here involved reveals that the public interest was clearly advanced by the conduct of defendants. The amount of the judgment recovered by Middlesex in its suit against Carteret and Booz when compared with the originally proposed compromise, prompts the conclusion that defendants' objections to and criticisms of the suggested settlement were not only warranted but substantiated. The facts upon which defendants bottomed these objections, as revealed upon the motion, might be said to have given rise to a duty as well as a right to make known to the municipal officials their objections to any settlement of claims, not only for their own benefit but also for the benefit and protection of other citizens and taxpayers in the community. Accordingly, defendants had and properly exercised a privilege to interfere with the prospective settlement between Middlesex and Carteret.

Plaintiffs suggest that defendants are not entitled to the comfort of this privilege because their actions were "mali-

ciously" prompted. They use that term in the ordinary parlance, meaning ill will, and not in the technical sense wherein it is defined as "the intentional doing of a wrongful act without justification or excuse." *Louis Kamm, Inc. v. Flink, supra,* at *p.* 588.

A purely malicious motive to injure plaintiffs should of course fall without the ambit of any privilege. It has been held, however, that where defendant has a proper purpose in view, the addition of ill will does not defeat the privilege. See *Prosser, supra, p.* 736 and cases thereunder. The record in this case affords no grounds for a conclusion that defendants' conduct was motivated by ill will, hence the defense of privilege or justification is available to defendants.

Affirmed.

*For affirmance*—Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For reversal*—None.