SYSTEM OPERATIONS, INC., a Delaware Corporation, and Mathematica, Inc., a New Jersey Corporation, Plaintiffs,

v.

SCIENTIFIC GAMES DEVELOPMENT CORPORATION, a Michigan Corporation, and Dittler Brothers, Inc., a Georgia Corporation, Defendants.

Civ. No. 76–250.

United States District Court, D. New Jersey.

Jan. 12, 1977.

Miller & Porter, Princeton, N. J., by William Miller, Allen D. Porter, Princeton, N. J., for plaintiffs.

McLaughlin, Abbotts & Cooper, Trenton, N. J., by James J. McLaughlin, Trenton, N. J., and Powell, Goldstein, Frazer & Murphy, Atlanta, Ga., by Eugene Partain, Harvey D. Harkness, Atlanta, Ga., for defendants Dittler Brothers.

Jamieson, McCardell, Moore & Peskin, Trenton, N. J., by Edward J. McCardell, Jr., Trenton, N. J., and Troutman, Sanders, Locerman & Ashmore, Atlanta, Ga., by Robert L. Mote, Ralph H. Greil, Atlanta, Ga., for defendants Scientific Games.

## OPINION

CLARKSON S. FISHER, District Judge.

This matter comes before the Court on plaintiffs' motion for a preliminary injunction enjoining interference with contractual relations and was heard on the return day of an order requiring the defendant Scientific Games Development Corporation (hereinafter "Scientific Games"), to show cause why such relief should not be granted. A temporary restraining order was entered against the defendant. As will be seen, this order was complied with and the defendant agreed to be bound by it until a decision by this Court on plaintiffs' motion for preliminary relief. This opinion must be read in light of a previous decision by this Court in this matter, *Systems Operations v. Scientific Games Dev. Corp.*, 414 F.Supp. 750 (D.N.J.1976) appeal pending U.S. Court of Appeals for the Third Circuit.

### FINDINGS OF FACT

On June 15, 1976 the State of Ohio began its first instant lottery game with plaintiffs' instant tickets. Over the next few weeks, Scientific Games, along with Dittler Brothers, Inc., who is not a defendant for purposes of the instant motion, developed a technique with which it tested the plaintiffs' Ohio tickets.[1] This technique, generally stated, involved the removal of the coating which covers the ticket's numbers in such a way as to reveal the numbers to a careful observer but not to the over-the-counter consumer. See discussion in 414 F.Supp. 750, 755 regarding the "breaking" of an instant ticket. Scientific Games felt that this technique successfully broke the plaintiffs' Ohio instant ticket and apparently contemplated what to do with this information in light of this Court's previous preliminary injunction.

On July 9, 1976 S.O.I. executives were meeting with lottery officials about a second instant game and various details regarding game design and prize structure as well as advertising were discussed. A program plan was subsequently prepared for submission to and approval by the Ohio Lottery Commission. There is testimony which suggests that Ohio may have been preparing to exercise its option under its first contract with the plaintiffs; however, it is also clear that plaintiffs had no firm commitment regarding the option or any contract at all for the running of a second instant lottery in Ohio. In addition, it appears from the testimony that at all times Scientific Games knew that S.O.I. was under contract with Ohio to operate an instant game; that Scientific Games took the action it did while the game was still in progress; and that it was very interested in obtaining the contract for the second instant lottery game in Ohio through compet-

---

1. Dr. Koza, president of Scientific Games testified:

   ". . . we went out and purchased tickets shortly after the game begun . . . and looked at [tested] the tickets shortly thereafter . . ." (T.–1, p. 140).

itive bidding.[2] Scientific Games did not know of the various meetings between S.O.I. and lottery officials regarding a second instant or any other lottery game.

On July 13 or 14, 1976 Scientific Games sent a letter to Mr. Gerald Patronite, the Director of the Ohio State Lottery and to Mr. David Leahy, the Chairman of the State Lottery Commission. (Exh. P–1). This letter, which will be examined in greater detail later, informs the Director and Commissioner that Scientific Games has become aware of "certain information" which it believes is "vitally important" to the lottery in progress in Ohio. The letter seeks an opportunity to demonstrate "the clear significance of our discovery", in the belief that it "will assist you in the service you are conscientiously attempting to render to the State of Ohio". The letter is accompanied by a two page "explanation" of this Court's previous decision, with references to the guidelines allegedly put forth by the Court[3] and references to the "insecurity of the competitor's product".

Some time between July 16th and 23rd Scientific Games received a telephone call from a Mr. Prososki, an auditor with the Ohio Lottery, who apparently made some vague references to some problems which he thought the lottery was having. He asked if Scientific Games knew anything.[4] The reply was to the effect that Scientific Games had "a method of reading the numbers". The auditor was also informed that a formal request for the information or demonstration would be necessary. Less than a week after this call, the auditor called again and requested a meeting and demonstration at the State Auditor's office before a Mr. Blum.

On July 26, 1976 the plaintiffs appeared before this Court seeking an order to show cause and a temporary restraining order.

Plaintiffs presented the Court with a copy of the defendant's letter to Mr. Patronite, the Ohio Lottery Director, and asserted that same constituted interference with a contractual relationship. The Court granted a temporary restraining order under which Scientific Games could conduct its demonstration or test, but not under the two conditions which were contained in its letter. (Exh. P–1). The defendant could not require the Lottery Director to choose a certified public accountant to witness the demonstration and report back to the Director; nor could it require that the Lottery Director or other Commission officials witnessing the test not make the information regarding the particulars of the demonstration and the results known to any competitor.

On July 29, 1976, Mr. Stephen Parisi, Legal Counsel to the Ohio Lottery, responded to the defendant's original letter (P–1). Noting the difficulty in determining exactly what it was that Scientific Games wished to bring to the attention of the Ohio Lottery and acknowledging the Commission wished "to obtain any legitimate information available to it in order to continuously examine the operating procedures of the Ohio Lottery", (Exh. P–2), the defendant's offer, vague though it was, was accepted. A date of August 2nd was initially suggested, however, that date was not convenient for all parties.

On July 30, 1976, Mr. Dan Bower of Scientific Games and a Mr. Banner of Dittler Brothers, Inc. demonstrated their technique for breaking the plaintiffs' Ohio instant ticket before Mr. Blum and Mr. Prososki, the state auditors in Columbus. On August 7, 1976, Mr. Bower conducted the same test before the Ohio Lottery Commission. From all that appears, the Commission reached no conclusions at this meeting, but took what

---

**2.** Ohio had the choice of exercising its option with S.O.I. for a second instant game, and did not have to open up competitive bidding.

**3.** The Court intends no comment on the accuracy of any of the statements contained therein.

**4.** Mr. Prososki called Scientific Games about another matter—a commercial venture involving tickets—and during one of these conversations he discussed the alleged problems with S.O.I. tickets and asked for information. (T.–1, pp. 185, 186).

it had seen under consideration. Three days later, S.O.I.'s president and vice-president were before the Ohio Commission to observe the demonstration performed by the lottery auditor, Prososki. By plaintiffs' own admission, the Commission was seriously considering stopping all sales statewide. After the S.O.I. officers and the lottery officials discussed the test results and their significance, however, it appears as if the Commission's concerns were quieted. In any event, on August 12, 1976 an independent laboratory report was submitted at the Commission's request, and the game apparently concluded without incident.

## CONCLUSIONS OF LAW

### A.

■ The first point for the Court to consider is whether any of the defendant's actions violated the terms of the March 22nd preliminary injunction as modified. The plaintiffs contend that defendant's letter to the Ohio Lottery Director is disparaging by implication. Whether such is the case this Court need not decide, for in any event the defendant has complied with the latter portion of the Court's preliminary injunction in making a full disclosure. *Systems Operations, supra* at 764–765.

■ The only other action by the defendant which presents a problem under the March 22nd order involves the communications with Mr. Prososki, a state auditor assigned to the lottery commission. The Court's order specifically refers to a "lottery director" and, although the terms of the order were specifically followed with regard to Mr. Patronite, the Ohio Director, the defendant also pursued a similar course with the state auditor's office. There is little evidence to suggest that Mr. Prososki was acting at the direction of the Ohio Lottery Director when he called the defendant, or when he arranged for a demonstration before Mr. Blum of the auditor's office. These actions went on quite apart from the

defendant's dealings with the Director. Although a written request was obtained, the March 22nd order was not technically complied with when the aforesaid activities between Scientific Games and the *state auditors* were undertaken. While this Court does not feel that there was any willful attempt on the part of the defendant to circumvent the latter portion of the preliminary injunction (Scientific Games probably believing it applicable to lottery *officials*), the Court cautions the defendant that it must strictly comply with the latter portion of the preliminary injunction if it is to avoid scrutiny *by this Court* as to whether it violated the first part of the March 22nd order regarding "false and disparaging" statements. As should be clear from the original opinion in this case, the Lottery Director is the individual directly responsible for the proper running of the games in his state, and it is his duty to protect the public interest in this regard. This Court does not feel that the public interest would be served by contacts with and demonstrations for other state officials who have no authority over or understanding of lottery operations.

### B.

■ Plaintiffs' main contention in the instant case centers on its claim of tortious interference with contractual relations. Such a claim is well recognized in New Jersey and is treated in the same general way as interference with a prospective economic advantage, business relations and similar torts.

> "The right to pursue a lawful business is a property right that the law protects against *unjustifiable* interference. Any act or omission which unjustifiably disturbs or impedes the enjoyment of such right constitutes its wrongful invasion, and is properly treated as tortious." (Emphasis original).

*Louis Kamm, Inc. v. Flink*, 113 N.J.L. 582, 586, 175 A. 62, 66 (E&A 1934).

> "The intentional causing of [a] loss to another, without justifiable cause, and

with malicious purpose to inflict it, is of itself a wrong."

*Id.,* at 587, 175 A. at 66.

"While a trader may lawfully engage in the sharpest competition with those in a like business, by offering extraordinary inducements, or by representing his own goods to be better and cheaper than those of his competitors, yet when he oversteps that line and commits an act with the *malicious intent of inflicting injury upon his rival's business,* his conduct is illegal, and if damage ensues from it the injured party is entitled to redress. And it does not matter whether the wrongdoer effects his object by persuasion or by false representation. The courts look through the instrumentality or means employed to the wrong perpetrated with the malicious intent, and provides the remedy to redress that wrong. [Citation omitted]." (Emphasis original).

*Id.,* at 587, 588, 175 A. at 66.

"Malice in the legal sense is the intentional doing of a wrongful act without justification or excuse. And a 'wrongful act' is any act which in the ordinary course will infringe upon the rights of another to his damage, except [and unless] it be done in the exercise of an equal or superior right."

*Louis Schlesinger Co. v. Rice,* 4 N.J. 169, 181, 72 A.2d 197, 203 (1950). See also *Kurtz v. Oremland,* 33 N.J.Super. 443, 455, 111 A.2d 100 (Ch.Div.1954).

■■ From the testimony and exhibits and the inferences drawn from this evidence, this Court is of the view that Scientific Games committed "wrongful acts", as defined above. With full knowledge of the relationship between S.O.I. and the Ohio Lottery, the defendant contacted state offi-cials and attempted to show them that plaintiffs' product was inferior and insecure. If the defendant's actions were successful, they would most likely result in the termination of plaintiffs' contract, an event which would benefit the defendant. Indeed it may be inferred from the testimony that the defendant knew it stood to benefit in this or in other ways and was acting in furtherance of that objective.[5] Moreover, the Court is convinced that the defendant intended to interfere with the existing contractual relations. In short, activities of the type present here are clearly actionable and, standing alone, would warrant the equitable remedy sought.[6] The important issue remaining, however, is whether the defendant's actions were "justified". Were the steps taken by Scientific Games privileged and, if so, what is the scope of that privilege?

"[I]t is essential in determining the availability of justification or privilege as a defense to assay the relationship of the parties *inter sese* within the social and factual context presented, as well as to weigh the relative merits of the rights and advantages affected by the alleged tortious conduct."

*Middlesex Concrete, etc., Corp. v. Carteret Industrial Ass'n,* 37 N.J. 507, 517, 181 A.2d 774, 780 (1962). In short, whether justification can be found for interference with the relationship:

". . . depends upon the sufficiency of the interest which the stranger seeks to advance."

*Ind. Dairy Workers Union v. Milk Drivers and Dairy Employees, Local No. 680,* 30 N.J. 173, 183, 152 A.2d 331 (1959). This Court has already examined at length the necessity for protection of the public interest in the area of state run lottery games.

---

**5.** In response to the Court's question as to whether part of the purpose of the letter to the Ohio Director was to ultimately get the Ohio business, Dr. Koza of Scientific Games replied:

"Down the road we knew the second game was at least supposed to go out to bid. . . [N]aturally we were interested in the Ohio business, certainly." (T.–1, pp. 157, 158)

**6.** "There is nothing new about the appropriateness of the remedy of injunction to restrain acts 'destroying a complainant's business, custom, and profits.' *Ferraiuolo v. Manno,* 1 N.J. 105, 108, 62 A.2d 141, 142 (1948). * * * One well-settled application of the doctrine is injunction to restrain an unjustified inducement of breach of contract." *Silverstein v. Abco Vending Service,* 37 N.J.Super. 439, 446, 117 A.2d 527, 531 (App.Div.1955).

*Systems Operations, Inc., supra* at 762–766. Indeed, the Court in a general way provided for the defendant to take some of the steps it took here in the terms of the March 22nd order. In the opinion it was noted:

> ". . . when the defendants are responding to written requests for assistance in ticket evaluation from a lottery director and such responses as relate to ticket security are accompanied by a full and factual explanation of how a ticket was determined to be insecure, the defendants' statements are privileged."

*Systems Operations, Inc., supra* at 765–766. See also, *Middlesex Concrete, supra,* recognizing the public interest as a basis for privilege. In the instant case, the defendant's actions are no less privileged. Scientific Games was generally doing what it was permitted to do in the public interest within this Court's previous order. While it may also have acted with ill will toward the plaintiffs, with the hope of injuring its business relations and reputation, this alone does not defeat the privilege. *Middlesex Concrete, supra,* 37 N.J. at 519, 181 A.2d 774 citing *Prosser, Law of Torts,* now in 4th Ed. at p. 943.

Although the Court finds that in general the defendant's actions in the instant case were privileged, the precise scope of that privilege is still in question.

> "The justification must be 'as broad as the act, and must cover not only the motive and the purpose, or, in other words, the object sought, *but also the means used.*' [Citation omitted]." (Emphasis added).

*Louis Kamm, Inc., supra,* 113 N.J.L. at 589, 175 A. at 67. The privilege to protect the public interest in this case extends far enough to cover the object sought by the defendant—malicious in part though it was. Whether the privilege extends so far as to cover the *means* which the defendant attempted to use in informing the Lottery Director of the alleged security problems with plaintiffs' ticket is another matter.

In the July 13th letter which Scientific Games sent to the Ohio Lottery Director and Commission Chairman, the disclosure of the "vitally important" "discovery" was conditioned upon the promise that ". . . anyone witnessing the demonstration not make this information available to any competitor." In addition, on the two page enclosure, the defendant stated:

> ". . . it is our preference to demonstrate that the accuracy and dependability of our technique can be objectively verified to your complete satisfaction by any of several reputable independent auditors. * * *

> . . . [W]e prefer not to reveal our testing techniques, but . . . we will test the tickets and samples in the presence of certified public accountants chosen by the Lottery Director from among any of the big 8 international accounting firms, and if they determine that a ticket or sample can be readily compromised . . . they will so inform you in an affidavit executed by them.

> . . . [T]his would be our preference, since it eliminates the possibility, however remote, of any inadvertent disclosure of our methodology and technology to any other competitor in your state or elsewhere."

Exh. P–1. The Court enjoined these preconditions in a temporary restraining order issued before the defendant proceeded with its demonstrations. After considering all of the testimony and fully considering the present legal issue regarding the scope of the defendant's privilege, the Court concludes that similar actions by the defendant, ostensibly taken in the public interest, must be taken without precondition, and the restraints must continue. If the lottery director is to effectively evaluate the security of a given ticket, he must, of course, have access to sources of information relevant to that subject, thus, the privilege permitting competitors to provide what might be devastating information insofar as the one under contract is concerned. Thorough and effective evaluation, however, is not accomplished by receiving only one side of the story, and a lottery director, especially one under contract with a ticket company

136

and with a game underway, must be free to discuss the alleged security problems with the ticket manufacturer. This can be seen in the instant case where grave concerns were apparently laid to rest after lottery officials met with S.O.I. executives regarding the alleged breaking of their ticket. Similar reactions by lottery officials were found in the earlier opinion of this Court. In short, it is not in the public interest to have insecure tickets on the street during the operation of a statewide game, but it is also not in the public interest to have a game abruptly discontinued or not started at all because of apprehension created from only one view of the security question. The "less restricted flow of *substantiated* factual information . . .", *Systems, supra* at 765, which this Court sought to provide by the modification of its previous order was not envisioned as a one-way street. The public interest would not be served by blocking the return flow of information to the lottery director. The defendant's privilege does not extend that far.

Scientific Games argues vicariously that in demonstrating techniques for breaking tickets it is disclosing trade secrets on the testing of tickets and is entitled to demand a pledge of confidentiality from those who witness same. Permitting the disclosure of the testing technique to competitors, it is asserted:

". . . places defendant in a position where it 'educates the competition' in a manner that permits them to inexpensively develop better instant lottery tickets."

Defendant's Mem. in Opposition p. 13. Indeed, the two page attachment to the Patronite letter suggests that this Court has already ruled that Scientific Games is entitled to the confidence of lottery directors. Such is not the case. In its earlier opinion this Court did not have before it the precise question of whether the information turned over to lottery directors constituted a trade secret. In fact, the Court expressed doubt as to whether such was the case. *Systems,*

*supra* at 763. While it stated the obvious law on the subject—*viz.,* if the information or technique were a trade secret the defendant could insist upon the confidence of the lottery director, the Court did not specifically rule one way or the other on that issue. Indeed the Court noted:

". . . if defendant truly desires to act in the public interest, it should be willing to explain how a ticket was broken in any event."

*Id.,* at 763.

The foregoing aside, the defendant's argument misunderstands what is being determined here. The Court is determining the extent of the privilege under which Scientific Games may interfere with the contractual and business relations of the plaintiff, S.O.I. The defendant does not have to disclose anything at all, to anyone, if it chooses not to. If it does decide to disclose a bona fide trade secret in another context, less affected with the public interest, it can insist upon the confidence of those obtaining the information. When it chooses, however, to take action which constitutes wrongful interference with contractual relations, the scope of the privilege controls the propriety of defendant's activities, not what it considers best for itself.[7] In addition, disclosure of trade secret information may itself be privileged.

"A privilege to disclose or use another's trade secret may arise from the other's consent or from other conduct on his part by which he is estopped from complaining. *A privilege to disclose may also be given by the law, independently of the other's consent, in order to promote some public interest."* (Emphasis supplied).

*Restatement of Torts,* § 757, comment *d* at 9 (1939). For the reasons suggested earlier, disclosure of the ticket testing information by a lottery director to the manufacturer under contract would be privileged in the public interest.

For all of the foregoing reasons, and the Court finding that all of the prerequisites for preliminary injunctive relief have been

7. The Court does not intimate any opinion on what the defendant might require by way of

confidentiality when it receives a truly unsolicited request for ticket evaluation.

met, *Oburn v. Shapp,* 521 F.2d 142, 147 (3d Cir. 1975), the plaintiffs' motion for a preliminary injunction is granted. Plaintiffs shall submit an order consistent with this opinion.