**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

BARRIE M. PETERSON; BARRIE M.
PETERSON, Trustee; NANCY A.
PETERSON,
Plaintiffs-Appellants,

v.

No. 97-1764

WILLIAM COOLEY; MID-PACIFIC
FUNDING CORPORATION; C.F.
HOLDINGS, INCORPORATED, t/a C.F.
Trust, Incorporated,
Defendants-Appellees.

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Claude A. Hilton, Chief District Judge.
(CA-96-1459-A)

Argued: March 5, 1998

Decided: April 21, 1998

Before WILKINSON, Chief Judge, and WIDENER and
NIEMEYER, Circuit Judges.

_____

Affirmed by published opinion. Chief Judge Wilkinson wrote the
opinion, in which Judge Widener and Judge Niemeyer joined.

_____

**COUNSEL**

**ARGUED:** Christopher Andrew Myers, HOLLAND & KNIGHT,
Washington, D.C., for Appellants. Harvey Alan Levin, BIRCH,

HORTON, BITTNER & CHEROT, Washington, D.C., for Appellees.
**ON BRIEF:** Gloria B. Solomon, Craig A. Holman, HOLLAND &
KNIGHT, Washington, D.C., for Appellants.

_____

**OPINION**

WILKINSON, Chief Judge:

Barrie and Nancy Peterson sued William Cooley, Mid-Pacific
Funding Corporation, and C.F. Trust, Inc. for tortious interference
with contractual relations and statutory conspiracy to injure their busi-
ness, Va. Code Ann. § 18.2-499. The district court granted summary
judgment in favor of the defendants on the grounds that no contract
existed and that the defendants acted properly in pursuit of legitimate
business purposes. The Petersons appeal, arguing both that the district
court lacked diversity jurisdiction and that it erred in dismissing their
claims on summary judgment. We hold that there is diversity of citi-
zenship here, and that the defendants' motion for summary judgment
was properly granted. Accordingly, we affirm the judgment of the dis-
trict court.

I.

On November 1, 1993, DEP, Inc. executed two commercial prom-
issory notes ("1993 notes") for a total amount of $6,064,903.57 pay-
able to Central Fidelity, a Virginia bank. The notes were endorsed by
Barrie Peterson, who is now the sole shareholder of DEP; Barrie
Peterson, Trustee; and Nancy Peterson. Both notes were secured by
first lien deeds of trust on three pieces of real property located in
Prince William County, Virginia -- the Dominion Professional Cen-
ter, the Elm Farm Mobile Home Park, and the Pick-A-Pair acreage.
Between October 1994 and January 1995, Central Fidelity placed the
1993 notes on nonaccrual status. Because DEP and the Petersons
lacked the necessary financial resources, the bank was repeatedly
forced to pay long-overdue sewer and water bills, as well as delin-
quent real estate taxes, on the properties. Central Fidelity, therefore,
sought a strategy for removing the nonperforming credit from its
books. In January 1995, Central Fidelity, DEP, and the Petersons

2

began negotiations concerning the discounted release of the 1993 notes.

Also in January 1995, William Cooley contacted Central Fidelity regarding the possible purchase of Central Fidelity's first-trust position on the Dominion Professional Center. Atlantic Funding Corporation, a company wholly owned by Cooley, held a $1 million note previously owned by the Resolution Trust Corporation ("RTC note") made payable by Barrie Peterson and secured by a second deed of trust on the Dominion Professional Center. Atlantic Funding also owned a judgment against Peterson on the RTC note for $1,217,202. Cooley became concerned that Peterson might attempt to purchase Central Fidelity's first-trust position on the Dominion Professional Center and thereby foreclose Atlantic Funding's second-trust position on the property. Cooley therefore called Central Fidelity, the holder of that first-trust position. Central Fidelity, however, rejected Cooley's only offer made at that time.

Meanwhile, negotiations between DEP, the Petersons, and Central Fidelity continued. During a March meeting between the parties, Central Fidelity orally proposed to sell the 1993 notes to the Petersons at a discount. Under the proposal, the Petersons would deliver a $4.2 million payment and a $200,000 deficiency note to Central Fidelity by October 13, 1995. The Petersons claim they unequivocally accepted Central Fidelity's alleged offer by letter dated April 13, 1995. Central Fidelity thereafter prepared a written settlement agreement, which contained the terms negotiated by the parties and which provided that it must be accepted by May 10, 1995. The Petersons, however, never signed it. On June 7, 1995, Central Fidelity sent the Petersons another settlement proposal designated "for discussion purposes only" and "not binding on either party." The Petersons responded two days later, calling the proposal "acceptable to proceed with," but noting that "there are some issues which need to be addressed in the final document."

Also in June 1995, Cooley again contacted Central Fidelity to renew his inquiry into the potential purchase of the first-trust position. Central Fidelity again rejected his offer but informed him that it was interested in selling the entire Peterson loan package. Cooley and Atlantic Funding then entered into a confidentiality agreement with

3

Central Fidelity, thereby allowing Cooley to review Central Fidelity's loan files in connection with the 1993 Notes and perform the necessary due diligence. The files contained Central Fidelity's correspondence with the Petersons and the never-executed settlement agreement. Central Fidelity's representative told Cooley that the bank had no agreement with the Petersons regarding the sale of the 1993 notes. In July 1995, Cooley and Atlantic Funding offered to purchase the 1993 notes from Central Fidelity for $3.51 million. Atlantic's rights in the deal were eventually assigned to the newly created C.F. Trust, Inc., which was formed in August 1995 solely to acquire and own the 1993 notes. C.F. Trust is incorporated in Florida and its president, corporate office, and corporate books are all located in that state. Negotiations with Central Fidelity were successfully concluded sometime in August 1995 and the 1993 notes were transferred to C.F. Trust.

The Petersons instituted the present suit by filing a motion for judgment in the Circuit Court of Prince William County, Virginia, alleging tortious interference with a contract, tortious interference with a contractual expectancy, and statutory conspiracy to injure their businesses pursuant to Va. Code Ann. § 18.2-499. The defendants were William Cooley; Mid-Pacific Funding Corporation, of which Cooley is the sole shareholder; and C.F. Trust, Inc., for which Cooley serves as Vice President, and of which Mid-Pacific is a 25 percent shareholder. Defendants removed the action to the United States District Court for the Eastern District of Virginia. The district court denied the Petersons' motion for remand to state court based on lack of complete diversity between the parties, and granted defendants' summary judgment motion as to each cause of action. The Petersons now appeal.

II.

We first consider the Petersons' claim that this case should be remanded to state court for lack of complete diversity between the parties. Specifically, they argue that C.F. Trust is a citizen of Virginia, the same state of which they are citizens. Congress has provided that cases where there is no federal question jurisdiction "shall be removable only if none of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is

4

brought." 28 U.S.C. § 1441(b). As a corporation, C.F. Trust is considered "to be a citizen of any State by which it has been incorporated and of the State where it has its principal place of business." Id. § 1332(c)(1). Because C.F. Trust is incorporated in Florida, the question of whether removal was appropriate turns on whether the corporation has its principal place of business in Virginia.

We have approved two tests for ascertaining a corporation's principal place of business for jurisdictional purposes, but have endorsed neither to the exclusion of the other. Mullins v. Beatrice Pocahontas Co., 489 F.2d 260, 262 (4th Cir. 1974) (per curiam). The first test, now commonly referred to as the nerve center test, "makes the `home office,' or place where the corporation's officers direct, control, and coordinate its activities, determinative." Id. The second test, normally termed the place of operations test, instead "looks to the place where the bulk of corporate activity takes place." Id.

We believe that application of the nerve center test is more appropriate here. The place of operations test presumes the existence of physical operations by which a corporation's presence in different states can be measured. As a result, the test is applied when a company has multiple centers of manufacturing, purchasing, or sales. See Industrial Tectonics, Inc. v. Aero Alloy, 912 F.2d 1090, 1094 (9th Cir. 1990) (tangible property, production activities, purchasing, sales); Topp v. CompAir, Inc., 814 F.2d 830, 834 n.3 (1st Cir. 1987) (factories, warehouses, sales offices); Grimm v. Plasma Processing Corp., 888 F. Supp. 56, 58 (S.D.W. Va. 1995) ("corporate activities test focuses on the location of the corporation's tangible assets"). By contrast, a corporation engaged primarily in the ownership and management of investment assets such as debt or equities is not really geographically bound. See, e.g., Gulf Chem. Corp. v. Raytheon-Catalytic, Inc., 931 F. Supp. 955, 957-58 (D.P.R. 1996). Because such corporations can readily transfer and move their investment assets, a jurisdictional test focusing on the location of operations makes little sense.

C.F. Trust is essentially a passive investment vehicle. The corporation was set up solely to acquire and own the 1993 notes. Accordingly, C.F. Trust does not have any manufacturing plants, purchasing centers, or sales facilities -- the normal indicia of a corporation's

5

place of operations. C.F. Trust owns only the 1993 notes -- investment assets -- and not the Virginia property by which the notes are secured. Given these facts, we believe that application of the place of operations test would be inappropriate.

The Petersons concede that if the nerve center test is applied, C.F. Trust's principal place of business cannot be Virginia and complete diversity of citizenship exists. We agree. Courts normally find the nerve center "where the activities of the corporation are controlled and directed," Topp, 814 F.2d at 834, or "where its executive headquarters are located." Metropolitan Life Ins. Co. v. Estate of Cammon, 929 F.2d 1220, 1223 (7th Cir. 1991). C.F. Trust's president, corporate office, and corporate books and records are located in Coral Gables, Florida. The corporation's two vice presidents are also permanent residents of Florida. Clearly, the direction and management of the corporation radiates out from Florida. It is easy therefore to conclude that under the nerve center test C.F. Trust's principal place of business for purposes of 28 U.S.C. § 1332(c)(1) is Florida, and not Virginia.

Even were we to follow the Petersons' suggestion and apply the place of operations test, our conclusion would not change. Initially, C.F. Trust has no operations in Virginia. The corporation has no offices or personnel in Virginia, and none of C.F. Trust's directors, officers, or shareholders are residents or citizens of Virginia. Furthermore, any operations C.F. Trust does conduct are outside Virginia. When applying the place of operations test, courts must consider the nature of a corporation's activity: "whether it is active or passive and whether it is labor-intensive or management-demanding." J.A. Olson Co. v. City of Winona, 818 F.2d 401, 411 (5th Cir. 1987). As we have already noted, C.F. Trust's only connection to Virginia is as a passive investor in notes secured by real estate located in the Commonwealth. C.F. Trust's only operations are therefore managerial in nature and are controlled and directed from Florida. Like its nerve center then, C.F. Trust's place of operations is Florida.

The Petersons argue, however, that C.F. Trust's acquisition of a certificate of authority to transact business in Virginia proves the Commonwealth is its place of operations. We do not find this certificate to be determinative of our jurisdictional inquiry. The mere fact that C.F. Trust is permitted to transact business in Virginia is irrele-

6

vant because the corporation does not actually conduct any operations within the Commonwealth. Other courts have similarly declined to attach significance to a corporation's authority to transact business within a state when other factors tend to show the corporation's principal place of business is in a different state. Vareka Invs., N.V. v. American Inv. Properties, Inc., 724 F.2d 907, 910 (11th Cir. 1984) (corporation's principal place of business found to be Ecuador despite qualifying to do business in Florida). Even more importantly, the Petersons' reliance on Virginia corporate law to prove C.F. Trust's principal place of business is undercut by further provisions of that code. For example, Virginia law makes clear that"[c]reating or acquiring indebtedness, deeds of trust, and security interests in real or personal property" does not constitute transacting business in the Commonwealth. Va. Code Ann. § 13.1-757(B)(7). Although not dispositive of the separate federal jurisdictional question, the Virginia statute does confirm our judgment that this form of passive investment in instruments of indebtedness does not constitute the transaction of business in the state.

Finally, other courts' decisions support the result we reach today. In Vareka Investments, the corporation in question "was formed as a passive investment vehicle in order to invest funds in United States real estate." 724 F.2d at 910. The corporation was not involved in the day-to-day operation of the Florida commercial real estate; it had no employees in Florida; and its corporate books and records were in Ecuador. Applying a jurisdictional test that incorporated elements of both the nerve center and place of operations tests, the Eleventh Circuit found the corporation's principal place of business to be Ecuador, and not Florida. Id.; see also Village Fair Shopping Ctr. Co. v. Sam Broadhead Trust, 588 F.2d 431, 434 (5th Cir. 1979) ("single passive investment" was not determinative). We agree with the reasoning of cases like Vareka and hold that C.F. Trust's principal place of business is Florida. Accordingly, the diversity of citizenship between the parties was complete and removal of this case to federal district court was proper.

III.

A.

The Petersons next dispute the district court's grant of summary judgment on their claims of tortious interference with a contract and,

7

alternatively, tortious interference with a contractual expectancy. To make such claims in Virginia a plaintiff must prove the following elements: "(1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted." Chaves v. Johnson, 335 S.E.2d 97, 102 (Va. 1985). Additionally, when alleging tortious interference with an expectancy rather than with an actual contract, a plaintiff must show that the defendant interfered by employing improper methods. Duggin v. Adams, 360 S.E.2d 832, 836 (Va. 1987); Chaves, 335 S.E.2d at 103; Allen Realty Corp. v. Holbert, 318 S.E.2d 592, 597 (Va. 1984).

The Petersons contend that the district court erred by finding that no valid contractual relationship existed between themselves and Central Fidelity. They claim that Central Fidelity made an oral offer to them in a March meeting under which they could purchase the 1993 notes from the bank for a $4.2 million payment plus a $200,000 deficiency note. They contend that a valid contractual relationship was created when they unequivocally accepted this offer in an April 13, 1995 letter.

We disagree that such a contractual relationship was created by the Petersons' April 13 "acceptance." No evidence supports the Petersons' claim that the parties intended the March settlement discussions to become binding absent a signed agreement. Indeed, a transaction of this size and complexity is normally embodied in a written contract. And in fact, Central Fidelity's notes, to which the Petersons point in support of their argument, show that the March meeting was to be followed up by receipt of a "signed settlement agreement." True to this practice, once the Petersons indicated their agreement to the bank's proposed settlement terms through their April 13 letter, Central Fidelity forwarded a twenty-nine page, typed settlement agreement incorporating the terms negotiated by the parties. Although Central Fidelity's representative signed the agreement and thereby bound the bank, the Petersons chose not to sign or deliver it by the required date. The agreement itself made clear that it had to be accepted by May 10, 1995 and that "time [was] of the essence." Despite these clear indications, the Petersons themselves chose not to

8

create a binding contractual relationship with Central Fidelity by not signing the agreement. Central Fidelity's representative confirmed this by writing to Barrie Peterson on May 11, 1995 to indicate that the settlement offer "expired on May 10, 1995 and is void since it was not accepted by the required parties."

The Petersons alternatively claim that a valid contractual relationship arose from a second set of correspondence between themselves and Central Fidelity. They assert that Central Fidelity made another settlement offer in a June 7, 1995 letter, which they accepted in a letter two days later. The Petersons, however, conveniently omit the fact that Central Fidelity's letter contained a header that clearly stated "FOR DISCUSSION PURPOSES ONLY" and that the body of the letter again indicated that "this information is for discussion purposes only and is not binding on either party." The Central Fidelity letter obviously was not intended to be a formal settlement offer. Furthermore, the Petersons' response, while indicating that Central Fidelity's terms were "acceptable to proceed with," also stated "however, there are some issues which need to be addressed in the final document." Thus, even if Central Fidelity's discussion-only proposal sufficed as an offer, the Petersons' response hardly served as an unqualified acceptance. Because the Petersons have failed to produce evidence showing that any valid contractual relationship existed between themselves and Central Fidelity, they fail to satisfy even the first element of a tortious interference with contract claim.

B.

The Petersons alternatively argue that the evidence of lengthy negotiations between themselves and Central Fidelity shows a contractual expectancy that deserves protection from the defendants' alleged tortious interference. They claim that the defendants improperly interfered with this contractual expectancy by reviewing confidential information in Central Fidelity's loan files and by thereafter secretly concealing the fact such a review was taking place by entering into a confidentiality agreement with the bank. This claim, however, falters on two grounds.

Initially, the Petersons must prove causation -- that the defendants' alleged intentional interference "induc[ed] or caus[ed] a breach or ter-

9

mination of the relationship or expectancy." <u>Chaves</u>, 335 S.E.2d at 102. This they have failed to do. The evidence shows that Central Fidelity itself broke off negotiations with the Petersons for reasons independent of any alleged improper interference by the defendants.

Michael Paulson, a Senior Vice President of Central Fidelity, testified that by the time Cooley contacted him again in June 1995, his bank was interested in selling the entire Peterson loan package, if not to Cooley then to other investors. Furthermore, the Petersons failed to satisfy a key requirement for continued negotiations with Central Fidelity: they did not remain current on their loan payments to the bank. Paulson testified that as a result of delinquent loan payments, he intentionally stopped discussions with the Petersons. Simply put, the Petersons' own default led to the end of their negotiations with Central Fidelity, not any allegedly improper interference on the part of defendants.

The Petersons' claim also fails because they have not shown that the defendants employed any improper methods in purchasing the 1993 notes from Central Fidelity. The Virginia Supreme Court has explained what forms of business conduct are considered improper:

> Methods of interference considered improper are those means that are illegal or independently tortious, such as violations of statutes, regulations, or recognized common-law rules. . . . Methods also may be improper because they violate an established standard of a trade or profession, or involve unethical conduct. Sharp dealing, overreaching, or unfair competition may also constitute improper methods.

<u>Duggin</u>, 360 S.E.2d at 836-37 (citations omitted). Examples of such improper methods include "violence, threats or intimidation, bribery, unfounded litigation, fraud, misrepresentation or deceit, defamation, duress, undue influence, misuse of inside or confidential information, or breach of a fiduciary relationship." <u>Id.</u> at 836.

Generally speaking, Cooley purchased the 1993 notes for a legitimate business purpose, protecting his ability to collect the RTC judgment he had previously purchased. <u>Levine v. McLeskey</u>, 881 F. Supp. 1030, 1055-56 (E.D. Va. 1995). The Petersons fail to demonstrate that

10

any of Cooley's actions constituted an illegal or independently tortious act, or even violated an established business practice. Cooley simply did what any purchaser of credit would do in the same circumstances; he investigated and reviewed all available information pertaining to the Petersons' ability to meet their loan obligations before committing himself to purchasing the 1993 notes. The lawful acquisition of information necessary for sound business decisions is not a tortious act. Furthermore, Central Fidelity's requirement that Cooley sign a confidentiality agreement with respect to the contents of the loan file was customary in the business. The Petersons simply fail to provide a reason why Cooley's actions should be considered legally improper. The district court thus properly granted summary judgment on this claim in favor of the defendants.

C.

The Petersons finally dispute the district court's grant of summary judgment on their claim of statutory conspiracy to injure another in their business. Section 18.2-499 of the Virginia Code prohibits two or more persons from conspiring for the purpose of "willfully and maliciously injuring another in his reputation, trade, business or profession by any means whatever." Va. Code Ann. § 18.2-499(A)(i). The Petersons argue that Cooley and Central Fidelity violated § 18.2-499 by conspiring to injure them in their business.

We need not pause long on this argument. Although a plaintiff need not prove personal spite, Commercial Bus. Sys., Inc. v. BellSouth Servs., Inc., 453 S.E.2d 261, 267 (Va. 1995), the alleged conduct must at least be aimed at damaging another's business. Nationwide Mut. Fire Ins. Co. v. Jones, 577 F. Supp. 968, 970 (W.D. Va. 1984). The Petersons have produced no evidence that Cooley or Central Fidelity acted out of a desire to injure the Petersons in their business. Indeed, any damage to the Petersons' business would only prejudice Cooley and Central Fidelity's ability to recover as creditors. Moreover, Cooley acted for the legitimate business purpose of protecting his RTC judgment against Barrie Peterson. More generally, Cooley acted out of a legitimate business desire to profit by the purchase of loans. Were we to allow the Petersons' suit to proceed, we would subject every sale of debt to a potential conspiracy charge by the disgruntled debtor. Needless to say, such a prospect would impose a practical

11

freeze on the transferability of debt in Virginia. Because the Petersons have failed to uncover any specific evidence of Cooley's alleged purpose of "willfully and maliciously injuring" them in their business, we hold that the district court correctly granted summary judgment on this count.

IV.

For the foregoing reasons, we affirm the judgment of the district court.

AFFIRMED

12