**MAGGIO–ONORATO AND ASSOCIATES, et al., Plaintiffs,**

**v.**

**AEGON N.V., et al., Defendants.**

**No. CIV. JFM–99–3389.**

United States District Court, D. Maryland.

June 28, 2000.

Thomas J. Zagami, Hodes, Ulman, Pessin & Katz, P.A., Towson, MD, for Richard A. Onorato.

Robert J. Mathias, Piper & Marbury, Baltimore, MD, Keara M. O'Donnell, Piper & Marbury, Washington, DC, for defendants.

## MEMORANDUM

MOTZ, District Judge.

Plaintiffs Maggio–Onorato and Associates, Inc., Maggio–Onorato and Associates of Texas, Inc., Andrew A. Maggio, Sr., and Richard A. Onorato ("MOA") initiated this lawsuit against defendants AEGON, N.V., AEGON USA, Inc., and Bankers United Life ("AEGON") in the Circuit Court for Baltimore County.[1] MOA asserts causes of action for breach of contract, negligent misrepresentation, and concealment / non-disclosure, arising out of an agreement with AEGON concerning the marketing and development of an employee benefit plan designed by MOA. MOA also makes a demand for an accounting. AEGON USA and Bankers United Life removed the action to this court, asserting both federal question and diversity jurisdiction. *See* 28 U.S.C. §§ 1331, 1332. AEGON, N.V. gave its consent to the removal. MOA now moves to remand for lack of subject matter jurisdiction. *See* 28 U.S.C. § 1447(c). For the reasons that follow, the motion will be granted.

### I.

AEGON USA, an insurer with operating divisions across the United States, is incorporated in Iowa. For purposes of determining diversity jurisdiction, however, a corporation is deemed to be a citizen not only of the State of its incorporation but also the State where it has it principal place of business. MOA argues that, for the relevant time period, AEGON USA had its principal place of business in Mary-

---

1. AEGON USA is a wholly owned subsidiary of AEGON N.V., a Dutch corporation, and is the parent company of Bankers United Life.

land. MOA also argues that federal question jurisdiction is lacking because it has asserted no federal claim.

■ In general, the removing party bears the burden of establishing federal jurisdiction and the removal statute is strictly construed against federal jurisdiction for the following reasons: federalism concerns, respect for plaintiff's choice of forum, and following Congress' intent to control diversity caseloads. *See Gilman v. Wheat, First Securities, Inc.*, 896 F.Supp. 507, 509 (D.Md.1995).

## II.

■ The Fourth Circuit recognizes two tests for determining the location of a corporation's principal place of business—the "place of operations test" and the "nerve center test." *See Mullins v. Beatrice Pocahontas Co.*, 489 F.2d 260, 262 (4th Cir. 1974). "The place of operations test presumes the existence of physical operations by which a corporation's presence can be measured." *Peterson v. Cooley*, 142 F.3d 181, 184 (4th Cir.1998); *see e.g. Industrial Tectonics, Inc. v. Aero Alloy*, 912 F.2d 1090, 1094 (9th Cir.1990) (tangible property, production activities, purchasing, sales); *Topp v. CompAir, Inc.*, 814 F.2d 830, 834 n. 3 (1st Cir.1987) (factories, warehouses, sales offices). The nerve center test is appropriate in cases such as this where the assets of the relevant corporation can be "readily transfer[red]" and do not "really geographically bound" the corporation. *Peterson*, 142 F.3d at 184; *See Topp*, 814 F.2d at 834 (finding that nerve center test "was developed for cases involving corporations with complex and farflung activities"). As AEGON USA acknowledges, since it is a holding company with widespread sources of revenue, dispersed operations, and little tangible property, the nerve center test applies to this case.

■ In applying the nerve center test, courts look for "where the activities of the corporation are controlled and directed", *Id.* at 834, and place "a general emphasis on the locus of managerial and policy-making functions of the corporation." *Toms v. Country Quality Meats*, 610 F.2d 313, 315 (5th Cir.1980). Additionally, while it is possible for corporate citizenship to shift over time, the nerve center inquiry must focus on the time that the action was commenced. *See Freeport–McMoRan, Inc. v. K N Energy, Inc.*, 498 U.S. 426, 428, 111 S.Ct. 858, 112 L.Ed.2d 951 (1991); *Athena Automotive v. DiGregorio*, 166 F.3d 288, 290 (4th Cir.1999).

A determination of corporate citizenship must depend on the facts of the individual case and, above all else, should be "consonant with corporate reality." *Ellis v. Provident Life & Accident Ins. Co.*, 929 F.Supp. 751, 754 (S.D.N.Y.1996). As discussed earlier, AEGON bears the burden of establishing federal jurisdiction and any ambiguity must be resolved in favor of MOA0—the party opposing removal. *See Gilman*, 896 F.Supp. at 509; *Jones v. General Tire & Rubber Co.*, 541 F.2d 660, 664 (7th Cir.1976). In short, the evidentiary burden falls "squarely upon the removing party" seeking the federal forum. *R.G. Barry Corp. v. Mushroom Makers Inc.*, 612 F.2d 651, 655 (2d Cir.1979).

In its effort to meet its burden, AEGON has submitted an affidavit in which its general counsel states that "[d]uring all relevant times, specifically from September 1999 forward, AEGON USA has had the majority of its operations in Cedar Rapids, Iowa." Defs.' Ex. 1 at 2.[2] The record supports the general counsel's assertion that AEGON USA has had a significant operational presence in Cedar Rapids during the relevant time period. The corporation's legal staff is based in Cedar Rapids, and a substantial number of employees work in Cedar Rapids, includ-

---

**2.** I have considered the supplemental affidavit submitted by AEGON. As it does not change my analysis or findings regarding the nerve center of the corporation, I find it unnecessary to decide whether it constitutes a surreply implicating Local Rule 105.1.

ing several vice-presidents. Under the nerve center test, however, the analysis must focus upon where AEGON USA formed its corporate policy rather than "where the bulk of corporate activity [took] place." *Mullins v. Beatrice Pocahontas Co.*, 489 F.2d 260, 262 (4th Cir. 1974). Thus, AEGON USA's heavy operational presence in Cedar Rapids does not necessitate a finding that its principal place of business was in Iowa.

■ Much of the record is at odds with the general counsel's statement that "[g]enerally, all major planning and policy decisions related to AEGON USA are coordinated from Cedar Rapids, Iowa." Defs.' Ex. 1 at 3. The record shows that, for the relevant time period, four out of the eight members of AEGON USA's board of directors lived in Maryland—either in or around Baltimore—and that two other members lived in or around Washington, DC. Additionally, it is uncontested that no member of the board lived in Iowa during the relevant time period. While several vice-presidents may have resided in Cedar Rapids, it is not clear from the record that AEGON USA's "executive headquarters" was there or that any corporation-wide policy was being devised in Iowa. *Peterson v. Cooley*, 142 F.3d 181, 185 (4th Cir.1998).

The record shows that Donald Shepard, AEGON USA's chief executive officer and president—a Maryland resident shown by MOA to be heavily involved in the Baltimore community—stated in a November 1998 interview that "the headquarters of AEGON USA is where I happen to be." Pls.' Ex. 1 at 2. The record also shows that it was Shepard who made the decision that AEGON USA's headquarters would remain in Baltimore rather than relocate to Louisville. Additionally, MOA has submitted a newspaper article in which another AEGON USA executive stated that "having the headquarters in Maryland" enabled the corporation to run "more efficiently." Pls.' Ex. 6 at 1. Furthermore, it is undisputed that the state of Maryland was un-

der the impression that AEGON USA was based in Baltimore when, in May 1999, its Department of Business and Economic Development awarded the firm more than $2 million to assist with the expansion of its Baltimore operations.

AEGON N.V. itself published information around the relevant time period stating that AEGON USA was headquartered in Baltimore. In what appears to be early 1999, AEGON N.V. posted a summary of a pending merger with Transamerica Corporation. The summary, still posted as of November 1999—plainly stated that AEGON USA is "headquartered in Baltimore, Maryland." Pls.' Ex. 2 at 3. If AEGON USA's nerve center was truly in Cedar Rapids, it would have been unusual for AEGON N.V. to make such a representation when explaining its corporate structure in reference to a potential merger with Transamerica.

In its August 1999 investor bulletin, AEGON N.V. announced the consummation of the merger with Transamerica, which is based in California. In its opposition, AEGON contends that, "especially after" [the merger with a California corporation], "Iowa's centralized location within the continental United States" makes it the "logical and ideal locale from which to control and coordinate the company's's disperse operations." Defs.' Opp'n at 8. While this observation may be accurate, there is nothing in the record—other than the general counsel's affidavit—suggesting that, as of September 1999, any such nationwide coordination was in fact being effected by forces in Cedar Rapids or that the executive authority in Baltimore had been somehow diminished. In fact, the same bulletin which announced the merger with Transamerica noted that the Baltimore-based Shepard would become President and CEO of the combined AEGON USA/Transamerica operations. Moreover, the bulletin directed all shareholders in America to direct their inquiries to AEGON USA's Baltimore offices. Finally, an earnings update, published by AEGON N.V.

less than a month before MOA filed its complaint, also indicated that AEGON USA was based in Baltimore.

AEGON attempts to account for the inconsistencies in the record by concluding that Shepard's representations were "off-the-cuff," the newspaper articles submitted by MOA are "inconclusive," and that, overall, MOA's evidence is "unpersuasive." Defs.' Opp'n at 8–9. The burden to produce conclusive evidence, however, does not fall upon MOA but rather AEGON, the party seeking removal. *See R.G. Barry Corp. v. Mushroom Makers Inc.*, 612 F.2d at 655; *Gilman*, 896 F.Supp. at 509 (D.Md. 1995). At most, there is ambiguity surrounding the locale of AEGON USA's nerve center and such ambiguity must be resolved against AEGON. *See Jones*, 541 F.2d at 664.

### III.

#### A.

AEGON acknowledges that MOA's cause of action is not created by federal law. It contends, however, that the case cannot be adjudicated without the resolution of a substantial federal question, thereby creating federal jurisdiction. *See generally Franchise Tax Bd. v. Construction Laborers Vacation Trust*, 463 U.S. 1, 13, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983). Specifically, it asserts that MOA's claims arise under the Employment Retirement Income Security Act of 1974 ("ERISA") 29 U.S.C. § 1001 *et seq.* because MOA is seeking indemnity from AEGON for any damages which may result from a pending lawsuit in which the Department of Labor ("DOL") alleges that MOA violated certain ERISA provisions.

■ A cause of action arises under federal law "only if a federal question is presented on the face of the plaintiff's properly pleaded complaint." *Prihoda v. Shpritz, M.D.*, 914 F.Supp. 113, 116 (D.Md. 1996); *see also Gully v. First Nat'l Bank*, 299 U.S. 109, 112–13, 57 S.Ct. 96, 81 L.Ed. 70 (1936) (holding that federal law must be an "element, and an essential one, of the plaintiff's cause of action"). Removal is not proper due to "the mere presence of a federal issue in a state cause of action." *Merrell Dow Pharmaceuticals Inc. v. Thompson*, 478 U.S. 804, 813, 106 S.Ct. 3229, 92 L.Ed.2d 650 (1986).

■ Attempting to prove that MOA's action arises under ERISA, AEGON focuses on the allegations made by DOL in its pending lawsuit and MOA's request for indemnity from AEGON. It is clear from the amended complaint and the record, however, that lying at the heart of MOA's claims is a failed agreement regarding the marketing of a health care plan developed by MOA. MOA does not allege any "violations of ERISA itself ... with respect to any existing plan," nor is MOA "seeking benefits wrongfully withheld from them under any existing [ERISA] plan." *Hayes v. National Con–Serv, Inc.*, 523 F.Supp. 1034, 1036 (D.Md.1981).[3]

Issues regarding MOA's compliance with ERISA could eventually play a role in the calculation of its damages. Nonetheless, these issues are not "central to plaintiffs' basic contentions of breach by defendant[s] to plaintiffs of duties owed by defendant[s] to plaintiffs." *Hayes*, 523 F.Supp. at 1036. Instead, they are merely "possible or conjectural." *Gully*, 299 U.S. at 112–13, 57 S.Ct. 96. Likewise, the determination of whether ERISA fiduciaries, under 29 U.S.C. §§ 1102(a)(1), 1105, may seek contribution and indemnity against nonfiduciaries is only collaterally relevant to what is essentially a breach of contract

---

**3.** AEGON objects to "the plaintiffs' characterization of this case as unrelated to ERISA and involving nothing more than 'run-of-the-mill' contract and tort claims." Defs.' Opp'n at 18. Prior to the instant dispute, however, AEGON itself expressed similar sentiments, describing what is essentially a joint business venture between two parties that should be governed by "the express terms of the integrated contracts." Defs.' Opp'n to Pls.' Mot. to Disqualify at 2.

claim. In short, this is not the rare case where federal jurisdiction is conferred despite the absence of a cause of action not created by federal law.

### B.

▇ AEGON also attempts to recharacterize MOA's claim as a complaint arising under federal law pursuant to § 502(a), 29 U.S.C. § 1132(a) which provides for the complete preemption of claims falling within the scope of ERISA's civil enforcement provisions. *See Metropolitan Life Ins. Co. v. Taylor,* 481 U.S. 58, 63, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987). Specifically, AEGON contends that Count VI of MOA's complaint, in which it demands an accounting from AEGON, falls within § 502(a)(3) of ERISA, that provides for the enforcement of the terms of an ERISA plan and the enjoining of acts and practices in violation of such a plan. AEGON also asserts that several of MOA's claims "relate to" an employee plan and can be considered under § 514(a), 29 U.S.C. § 1144(a).

The complete preemption doctrine does establish a basis for removal in a variety of ERISA-related actions. *See e.g. Metropolitan Life,* 481 U.S. at 63–67, 107 S.Ct. 1542 (holding that state common law causes of action alleging improper processing of benefits under ERISA plan are removable); *Anderson v. Electronic Data Sys. Corp.,* 11 F.3d 1311, 1314 (5th Cir.1994) (finding state law claim alleging that plan fiduciary was demoted and terminated for refusing to violate ERISA fell within § 502(a) and was therefore removable); *Smith v. Dunham–Bush, Inc.,* 959 F.2d 6, 10–12 (2d Cir.1992) (holding that state action for breach of oral promise to pay benefits related to pension was removable to federal court). Here, however, it is clear from both the amended complaint and the record that MOA's demand for an accounting is not intended to "enjoin [an improper] act or practice" by AEGON within the meaning of § 502(a)(3). Neither is it intended "to redress such violations" or "enforce any provisions" of an employee benefit plan. § 502(a)(3). Rather, the demand for an accounting is designed to enable MOA to measure potential damages caused by the alleged breach of contract by compelling AEGON to "accurately calculate and distribute commissions earned by agents in the MOA Program." Pls.' Compl. at 27.

The connection between MOA's demand for accounting and the objectives behind § 502(a)(3) is simply too tenuous to warrant application of the complete preemption provision. *See Dukes v. U.S. Healthcare, Inc.,* 57 F.3d 350 (3rd Cir.1995) (holding that claims regarding the quality of plan benefits are not preempted and finding that " § 502 was [only] intended to provide each individual [plan] participant with a remedy in the event that promises made by the plan were not kept" by administrators); *Pizlo v. Bethlehem Steel Corp.,* 884 F.2d 116, 120–21 (4th Cir.1989) (finding that the mere inclusion of benefit payments in an equation for damages does not implicate the concerns underlying ERISA and does not trigger preemption).