# Juan O. Chaves

### v.

# H. C. Johnson, Jr.

Record No. 821206

September 6, 1985

Present: All the Justices

*H. Glenn Goodpasture (Claude Rackley, Jr.,* on brief), for appellant.
*Leland L. Baker, Jr.,* for appellee.

RUSSELL, J., delivered the opinion of the Court.

This is an action for damages based upon theories of defamation and tortious interference with contract rights. The jury awarded damages to the plaintiff on both theories. The trial court set the verdict aside and entered judgment for the defendant. We granted the plaintiff an appeal.

Juan O. Chaves is a licensed architect practicing in the Fredericksburg area. In September 1978, after soliciting bids from architects, the City of Fredericksburg awarded him a contract for architectural services. The contract provided that Chaves would make a study of the City's governmental space needs, would review the availability of existing properties to meet those needs, and would render complete architectural services with respect to additional construction work desired by the City. His fee was to be $3500 for the space study and 10% of construction costs for new construction. The contract was not specific as to the new construction desired, but at the time of its execution the City contemplated the renovation and conversion of an existing Post Office Building on Princess Anne Street into a new City Hall. Chaves was directed to develop a schematic design and a cost estimate for the project.

Chaves' cost estimate, submitted in April 1979, was for $723,720, plus his fee of $72,372, plus an allowance of $100,000 for furniture. The City Council members had contemplated spending less than $275,000 on the project. Chaves informed the City Council, "This is what you tell me you need. It's going to cost way in excess of what you want. Please tell me what to do." The Public Works Committee decided the cost of renovating the Post Office was too high and asked Chaves to investigate alternatives. He did a study of a potential new City Hall to be built on Caroline Street. Chaves submitted a plan for that project in June 1979.

H. C. Johnson, Jr., was another licensed architect practicing in the Fredericksburg area. He had submitted a competing bid for the City's Architectural Services Contract, quoting a lower fee, and was annoyed when the award was made to Chaves. Johnson testified:

It was important to me to let City Council know that I felt it was a reflection on me, and a reflection on my professional ability, and a reflection on my professional standing in the community, that it became public knowledge that they had by-passed me, they have not considered my proposal, they have hired somebody who does not have the experience that I have had; and at the same time, pay him fifty percent more. Now, that's got to tell somebody something.

On July 23, 1979, while the City Council was at an impasse concerning the cost of a new City Hall, Johnson wrote the following letter to the City Council:

July 23, 1979

Fredericksburg City Council
Fredericksburg, Virginia

Re: Proposed City Hall
Architectural Project

Members of Council:

Concerning the proposed City Hall Architectural Project. Over a prolonged period of time since Council selected an Architect for the above project it has come to my attention that members of Council did not review, or did not have, all relevant information when making the decision.

If having been aware of the facts it seems unreasonable to me that Council would retain an Architect who has had no prior experience in this type of project and agree to pay an Architectural fee that is over 50% more than what could be considered a reasonable fee.

I have been told by members of Council that they have never seen the proposal that I submitted, in response to Mr. Funk's request, and were not aware that I was really interested in the project.

I have also been told that a member of Council told other members of Council that I was too busy to work on the project. This is absolutely not true. Had I been too busy I would

not have submitted a proposal or told Mr. Funk, or stated in my proposal, that I was extremely interested in the project.

In view of the fact that I am a registered Architect, a permanent resident of the area, have maintained an office in the City for thirteen years and have paid many thousands of dollars to the City Treasurer in the form of Business License Tax, and have had as much experience as any Architect in the State with respect to this type of project, have submitted a reasonable fee schedule and have expressed a sincere desire to be considered for the project, it seems a considerable reflection on my professional reputation, as well as questionable judgement on Council's part, to retain an Architect of no past experience and agree to pay him an unjustifiably high fee.

Because of my failure to request a proper interview, which I had assumed would be an appropriate formality, at the time of the original architectural selection concerning the Post Office I do not necessarily feel that I am entitled to further consideration concerning that particular project, even though I feel that Council did not give my proposal fair and impartial consideration.

However, if it is Council's intention to consider a new City Hall at any location other than the Post Office I would at this time request that my original proposal be reviewed and reconsidered and a new architectural contract be awarded based on the requirements of the new project and the merits of those submitting proposals.

Further, if it is Council's intention to accept and review unsolicited architectural concepts for a new City Hall I would also appreciate some consideration with respect to such a presentation.

If you have not seen my original proposal I have enclosed a copy for your review. Of considerable importance, I feel, is the fact that I stated I was extremely interested in the project, that my fee in the $700,000.00 to $800,000.00 range would have been 6.5% of the construction cost, and that a study and determination of space needs was a part of my basic fee. If you also review the other proposals submitted and the contract that was eventually entered into by the City

it is clear that all facts were not considered when a decision was reached. It seems to me that on a project of this type the public interest is being poorly served if members of Council do not review all information that is readily available to them when making a decision involving hundreds of thousand (possibly millions) of dollars, and as a result select the person or firm who is readily available, is best qualified, and proposes to do the work for the most reasonable fee.

I ask only that all relevant facts and information receive fair and impartial consideration.

Sincerely,

/s/ H. C. Johnson, Jr.
Architect

Copy to: Mr. John Nolan
City Manager

Johnson hand delivered a copy of this letter to each council member, accompanied by a copy of his fee schedule and a list of his professional qualifications.

A week following the receipt of Johnson's letter, the Public Works Committee, consisting of five councilmen, held a closed executive session and thereafter, in a public meeting, voted to recommend that City Council terminate Chaves' contract. The seconder of the motion stated that he was voting to terminate the contract because "it had been pointed out to him" that Chaves' fees were "excessive" and his experience "not sufficient." Two weeks later, at a formal meeting, the City Council voted to accept the committee's recommendation and terminate Chaves' contract. No reason was stated for the Council's action.

After Chaves' termination, the City Council solicited new bids for architectural services. Johnson's bid was accepted, although lower bids were received.

Chaves filed a motion for judgment against Johnson in two counts. The first claimed $59,597 in actual damages and $30,000 in consequential damages on a theory of tortious interference with his contract rights. The second count claimed the same amount of actual damages and $30,000 in "consequential and punitive dam-

ages" on a theory of defamation. By a consent order, the claim for actual damages was increased to $107,145 under both counts.

At trial, eight of the eleven City Council members testified. Each denied that he had been influenced by Johnson's letter in deciding to vote to terminate Chaves' contract. Several councilmen cited specific areas of dissatisfaction with Chaves' schematic design. One councilman testified that he had decided as early as April 1979 that Chaves should be replaced and had discussed the matter with other councilmen. He also admitted that he had gone to Johnson's office a few days before Johnson wrote the letter of July 23, and had discussed the matter with Johnson, who had a copy of Chaves' design on his desk.

Both counts were submitted to the jury, which returned a verdict awarding Chaves $70,000 actual damages, $15,000 damages for humiliation and harm to his professional reputation, and $15,000 punitive damages. Under the instructions, the actual damages could have been awarded under either or both counts, but the two $15,000 awards could have been awarded only under the defamation count.

The trial court sustained Johnson's motion to set aside the verdict on the tortious interference count on the primary ground that there was no evidence to support the jury's finding that Johnson's letter was the proximate cause of Chaves' discharge. The court relied on the testimony of the eight councilmen that they had been motivated by other factors. The court set the verdict aside on the defamation count on the grounds that Johnson's statements were mere statements of opinion and were, furthermore, uttered under a qualified privilege. Chaves contends on appeal that both rulings were erroneous.

■ We agree with the trial court's ruling that the statements in Johnson's letter were, as a matter of law, mere statements of opinion, and were thus not actionable as defamatory words. Furthermore, they did not impugn Chaves' character or professional standing. *Cf. James* v. *Haymes,* 160 Va. 253, 168 S.E. 333 (1933). Chaves argues that the words characterizing him as inexperienced and his fees as excessive are actionable *per se* at common law, because, he contends, they impute to him unfitness to perform the duties of his employment and they prejudice him in his profession. We do not agree. Many physicians, it is to be hoped, cure their first patients. A charge of inexperience does not impute unfitness and is not defamatory *per se. Gray* v. *Central*

*Bank & Trust Co.,* 562 S.W.2d 656 (Ky. App. 1978) (Park, J., concurring). Further, a charge of inexperience is in its nature a relative statement, depending for its import largely upon the speaker's viewpoint. A corporal might seem inexperienced to a sergeant, but not to a private. The relative nature of such opinions is obvious to anyone who hears them.

Similarly, a charge that professional fees are excessive is largely dependent upon the speaker's viewpoint. In the world of commercial competition, statements by competitors that they can undersell others fall on prospective customers' ears like repetitive drumbeats. The most unsophisticated recipient of such a claim, made by one competitor against another, could only regard it as a relative statement of opinion, grounded upon the speaker's obvious bias, and having no tendency to defame.

■ Pure expressions of opinion, not amounting to "fighting words," cannot form the basis of an action for defamation. The First Amendment to the Federal Constitution and article 1, section 12 of the Constitution of Virginia protect the right of the people to teach, preach, write, or speak any such opinion, however ill-founded, without inhibition by actions for libel and slander. "[E]rror of opinion may be tolerated where reason is left free to combat it." Thomas Jefferson's First Inaugural Address (1801). "However pernicious an opinion may seen, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas." *Gertz* v. *Robert Welch, Inc.,* 418 U.S. 323, 339-40 (1974).

■ It is for the court, not the jury, to determine as a matter of law whether an allegedly libellous statement is one of fact or one of opinion. *Slawik* v. *News-Journal,* 428 A.2d 14 (Del. 1981); *Catalano* v. *Pechous,* 69 Ill. App. 3d 797, 387 N.E.2d 714 (1978); *Rinaldi* v. *Holt, Rinehart & Winston, Inc.,* 42 N.Y.2d 369, 366 N.E.2d 1299 (1977).

Because we hold as a matter of law that Johnson's letter was not defamatory, it is unnecessary to consider whether he was entitled to the defense of qualified privilege. Thus, the trial court correctly set aside that part of the verdict which awarded damages for defamation and entered judgment for Johnson on that count.

■ We take a different view, however, of the court's ruling on the count for tortious interference with contract rights. We have not previously had occasion to consider this precise aspect of the law of torts, although in *Worrie* v. *Boze,* 198 Va. 533, 95 S.E.2d

192 (1956), we affirmed a judgment granting relief for a tortious conspiracy to procure a breach of contract. There, we said: "It is well settled that the right to performance of a contract and the right to reap profits therefrom are property rights which are entitled to protection in the courts. Consequently, suits for procuring breach of contract proceed on this basis." *Id.* at 536, 95 S.E.2d at 196. Code § 18.2-499 provides criminal penalties and Code § 18.2-500 provides civil penalties for such conspiracies.

A right of action for tortious interference with contract rights was recognized by a majority of the judges of the Queen's Bench in *Lumley* v. *Gye,* 2 El. & Bl. 216, 118 Eng. Rep. 749 (1853). It has also been recognized by the Supreme Court of the United States, *Angle* v. *Chicago, etc., R. R. Co.,* 151 U.S. 1 (1894), and by many of our sister states, *see, e.g., Imperial Ice Co.* v. *Rossier,* 18 Cal.2d 33, 112 P.2d 631 (1941); *Cumberland Glass Mfg. Co.* v. *DeWitt,* 120 Md. 381, 87 A. 927 (1913), *aff'd,* 237 U.S. 447 (1915); *Childress* v. *Abeles,* 240 N.C. 667, 84 S.E.2d 176 (1954); *Smith* v. *Citizens and Southern Bank of S.C.,* 241 S.C. 285, 128 S.E.2d 112 (1962). The tort is succinctly described in Restatement (Second) Torts § 766 (1977):

### Intentional Interference with Performance of Contract by Third Party

One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

■ The elements required for a prima facie showing of the tort are: (1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted. *Calbom* v. *Knudtzon,* 65 Wash. 2d 157, 162-63, 396 P.2d 148, 151 (1964). Thus, the interferor's knowledge of the business relationship and his intent to

disturb it are requisite elements; malice is not. Restatement, *supra,* § 766 comment s.

■ An affirmative defense, for which the burden rests upon the defendant, is justification or privilege. It is similar, but not identical, to the defense of qualified privilege in the law of defamation. It is based upon the relationships between the parties and the balance to be struck between the social desirability of protecting the business relationship, on one hand, and the interferor's freedom of action on the other. Specific grounds for the defense, discussed *seriatim* in Restatement, *supra,* §§ 768-772 are: legitimate business competition, financial interest, responsibility for the welfare of another, directing business policy, and the giving of requested advice. *Calbom,* 65 Wash. 2d at 163, 396 P.2d at 152.

At trial, Johnson moved to strike Chaves' evidence on the ground of privilege or justification, and assigned cross-error to the court's refusal to grant his motion. On appeal, he argues that his letter to the City Council members was justified on the basis of financial self-interest, citing *Zoby* v. *American Fidelity Co.,* 242 F.2d 76 (4th Cir. 1957); freedom of speech, citing *Old Colony Donuts, Inc.* v. *American Broadcast Cos.,* 368 F. Supp. 785 (D. Mass. 1974); and the right of a taxpayer to complain of public expenditures, citing *Middlesex Concrete* v. *Carteret Industrial Association,* 37 N.J. 507, 181 A.2d 774 (1962).

■ The trial court correctly overruled Johnson's motion to strike. Some jurisdictions have held that a competitor is justified by economic self-interest in causing a third person not to enter into a prospective business relationship with another competitor, or not to continue an existing contract terminable at will, provided no "intentional, improper interference" is used, *cf. Allen Realty Corp.* v. *Holbert,* 227 Va. 441, 449, 318 S.E.2d 592, 597 (1984). His conduct is tortious, however, if he induces the third party to breach an existing contract which is not terminable at will. *Cumberland Glass Mfg. Co.* v. *DeWitt,* 120 Md. 381, 87 A. 927 (1913), *aff'd,* 237 U.S. 447 (1915). Restatement, *supra,* § 768. Chaves' contract with the City was terminable only for cause, not at will.

■ We are unpersuaded by Johnson's freedom-of-speech argument. By logical extension, it would apply to any verbal conduct, however tortious, and would completely destroy the right of action universally recognized. Our constitutional guarantees of free speech, as we have seen, protect expressions of opinion from ac-

tions for defamation. Those constitutional guarantees have never been construed, however, to protect either criminal, *Pedersen* v. *Richmond,* 219 Va. 1061, 254 S.E.2d 95 (1979), or tortious conduct, *Williams Printing Co.* v. *Saunders,* 113 Va. 156, 73 S.E. 472 (1912). Thus, obscenity, *KMA, Inc.* v. *City of Newport News,* 228 Va. 365, 372, 323 S.E.2d 78, 81 (1984), "fighting words," *Chaplinsky* v. *New Hampshire,* 315 U.S. 568, 572 (1942), and defamatory words, *Time, Inc.* v. *Firestone,* 424 U.S. 448 (1976), remain outside the scope of constitutionally protected free speech. The tort complained of here is an intentional wrong to the property rights of another, accomplished by words, not defamatory in themselves, but employed in pursuance of a scheme designed wrongfully to enrich the speaker at the expense of the victim. The law provides a remedy in such cases, and the constitutional guarantees of free speech afford no more protection to the speaker than they do to any other tortfeasor who employs words to commit a criminal or a civil wrong.

We likewise reject the defense of taxpayer's privilege in the context of this case. Although it is true that a taxpayer generally has a right to complain of illegal or improper expenditures of public funds, *Bledsoe* v. *Watson,* 30 Cal. App. 3d 105, 106 Cal. Rptr. 197 (1973), "[s]uch privileges, [those based on protection of public as well as private interests] however, do not justify officious, self-serving, or presumptuous assumption of responsibility and interference with the rights of others." *Calbom,* 65 Wash. 2d at 166, 396 P.2d at 153.

The trial court set aside the verdict for tortious interference on three grounds: (1) that no proximate cause was established, (2) that no intent to interfere on Johnson's part was established, and (3) that the evidence negated malice on Johnson's part. As stated above, malice is not required. Regarding proximate cause, the court relied on the unanimous statements of the eight councilmen who testified that they were not motivated by Johnson's letter in deciding to discharge Chaves. The jury, however, was not required to accept the councilmen's testimony. It was entitled to rely on the circumstantial evidence surrounding Johnson's relationships with certain councilmen, the timing of his letter, and particularly Chaves' testimony that the seconder of the motion to terminate his contract, after receiving Johnson's letter, explained his vote in a public meeting as based on Chaves' "excessive" fees and "not sufficient" experience which "had been pointed

out to him." This evidence was received without objection and was unrefuted. It furnished sufficient support for the jury's finding of proximate cause.

 Regarding Johnson's intent, the court relied on the statement in Johnson's letter that he realized that he was too late to compete for the Post Office renovation, but wished to be considered for any other City Hall plan the council might undertake. The court considered this a clear indication that Johnson lacked any intent to interfere with Chaves' existing contract, but was asking only to be considered for any future contract the City might award. This view was based on the erroneous assumption that Chaves' contract was limited to the Post Office renovation. As noted above, the contract was for architectural services for any project the City might decide upon, at any location.

We hold that the court erred in setting aside the verdict for actual damages based upon the count for tortious interference with contract rights. Accordingly, we will reverse the judgment in part, reinstate the verdict as to actual damages, and enter final judgment here for $70,000.00. We will affirm the judgment insofar as it set aside the awards of consequential and punitive damages based on defamation.

*Reversed in part,*
*affirmed in part,*
*and final judgment.*

COMPTON, J., dissenting in part.

I would affirm the judgment below in all respects. In my opinion, the trial court correctly decided that Johnson is not liable for interference with the plaintiff's contract rights.