PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

COMMERCE FUNDING CORPORATION,
*Plaintiff,*

v.

WORLDWIDE SECURITY SERVICES
CORPORATION,
*Defendant-Appellant,*

v.

SOUTHERN FINANCIAL BANK,
*Defendant-Appellee,*

and

BANK OF ASHEVILLE,
*Defendant.*

No. 00-1040

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Claude M. Hilton, Chief District Judge.
(CA-99-201-A)

Argued: March 1, 2001

Decided: April 20, 2001

Before KING and GREGORY, Circuit Judges, and
HAMILTON, Senior Circuit Judge.

Affirmed in part, vacated in part, and remanded by published opinion.
Judge Gregory wrote the opinion, in which Judge King and Senior
Judge Hamilton joined.

**COUNSEL**

**ARGUED:** Mark White Byrum, Jr., THE BYRUM LAW OFFICES, P.C., Alexandria, Virginia, for Appellant. James MacGregor Collins, DRAPER & GOLDBERG, P.L.L.C., Leesburg, Virginia, for Appellee. **ON BRIEF:** L. Darren Goldberg, DRAPER & GOLDBERG, P.L.L.C., Leesburg, Virginia, for Appellee.

---

**OPINION**

GREGORY, Circuit Judge:

Worldwide Security Services Corporation ("Worldwide") appeals from a grant of summary judgment on each of two cross-claims it asserted against Southern Financial Bank ("Southern") for tortious interference with contractual relations and tortious interference with prospective economic advantage in an interpleader action to determine the entitlement to the proceeds of certain government contracts. As for the contractual relations claim, the district court ruled that Southern's interference was justified or privileged because Southern acted for the purpose of protecting its own "financial interest." Regarding the prospective economic advantage claim, the court ruled that Southern had not engaged in the type of improper conduct that is actionable under Virginia law. We agree with respect to the prospective economic advantage claim and disagree where the contractual relations claim is concerned. We therefore affirm in part, vacate in part, and remand.

I.

In September 1996, the United States Department of Labor awarded a contract to Denmark Security, Inc. ("Denmark") under which Denmark was to provide security guard services. The Federal Bureau of Investigation ("FBI") awarded Denmark two similar contracts in September 1997. In late 1996 and early 1997, however, Denmark was in need of capital. Southern loaned Denmark a total of $80,000.00 and Denmark, in turn, granted Southern a security interest in, *inter alia*, accounts receivable of Denmark. Southern properly perfected its security interests.

Denmark continued to experience financial problems. As a result, Worldwide commenced discussions with Denmark in early 1998 regarding a potential purchase. Although Worldwide and Denmark first discussed a stock purchase agreement, Worldwide contends that Denmark misrepresented information regarding its debts, causing Worldwide to explore the possibility of an asset purchase agreement instead.

In late April 1998, Denmark, still in search of additional operating funds, entered into a factor agreement with Commerce Funding Corporation ("Commerce") in which Denmark assigned to Commerce, *inter alia*, its accounts receivable, including amounts due under the two Denmark-FBI contracts. After Commerce properly perfected its security interests, Commerce, Southern, and Denmark entered into an inter-creditor agreement under which Southern's security interests in Denmark's receivables were subordinated to those of Commerce.

On or about May 4, 1998, Worldwide entered into a loan agreement with the Bank of Asheville.[1] As a part of that transaction, Worldwide granted the Bank of Asheville a security interest in, *inter alia*, its "contract rights." The Bank of Asheville then filed a financing statement to perfect its security interests.

Worldwide contends that on or about June 2, 1998, the FBI assigned the two Denmark-FBI contracts to Worldwide in a phone conversation. On that same day, according to Worldwide, the Department of Labor assigned the Denmark-Department of Labor contract to Worldwide in a separate phone conversation. The evidence shows that Southern never consented to these transactions.

By June 4, 1998, Worldwide had decided to purchase Denmark's assets. The parties entered into an asset purchase agreement, and Denmark ceased operations that day. Worldwide began performing the FBI and Department of Labor contracts (collectively, the "Government Contracts") the very next day. Two days later, Denmark, Worldwide, and the Department of Labor entered into a novation agreement which purported to recognize Worldwide as the successor party to

---

[1]The record before us does not reveal the amount of the Bank of Asheville-Worldwide loan.

Denmark's contract with the Department of Labor. The asset purchase agreement closed on June 12, 1998, and Denmark went out of business on that date.

On June 30, 1998, Worldwide, also in search of operating capital, entered into a one-year factor agreement with Commerce.[2] In that agreement, Worldwide assigned to Commerce the proceeds from its performance under any and all of its contracts.[3] Commerce thereafter collected receivables from those contracts to satisfy Worldwide's debts under the factor agreement. Under the terms of the agreement, if Commerce collected receivables in excess of Worldwide's then-current debt to Commerce, then Commerce turned the excess funds over to Worldwide or its other creditors.

Worldwide contends that by approximately mid-July 1998, Commerce had collected receivables sufficient to satisfy Worldwide's debt to Commerce. Accordingly, Worldwide expected to receive payments from Commerce. On July 14, 1998, however, Southern learned of the Worldwide-Denmark asset purchase agreement. On July 20, 1998, Southern sent a letter notifying Denmark that it had not complied with the terms of its loan agreements with Southern, and that full payment in the amount of $72,337.33 was due. On the next day, Southern sent a letter to Commerce demanding that Commerce send to Southern, as a secured creditor of Denmark and the secondary lienholder against the two Denmark-FBI contracts, "any excess paid funds" from the receivables Worldwide had assigned to Commerce.

Southern reiterated its claim to Commerce in a letter dated July 24, 1998. Southern asserted that under the terms of its loan and security agreements with Denmark and its inter-creditor agreement with Commerce, it was the secondary lienholder on accounts receivable from the Denmark-FBI contracts, and it was the primary lienholder on any proceeds Commerce collected from contracts that were not subject to

---

[2]The term was automatically renewable for successive one-year periods, unless Worldwide canceled the agreement at least thirty (30) days prior to the last day of the then-effective term.

[3]On June 28, 1998, the FBI issued two notices of assignment, each of which provided that Worldwide assigned any payments due under the two FBI contracts to Commerce.

the Commerce-Southern inter-creditor agreement. Southern also claimed that its liens were valid because it had neither been given notice of nor consented to the sale of Denmark's contracts.

On August 6, 1998, counsel for Worldwide demanded by way of letter that Southern immediately withdraw its demand that Commerce pay to Southern funds Commerce held on behalf of Worldwide (the "Receivables"). In that letter, Worldwide contended that Southern's claims had no legal basis. Chief among Worldwide's stated reasons were that (a) Southern possessed liens on the receivables of Denmark rather than those of Worldwide, and (b) Southern's security agreements were improperly marked and filed. Worldwide also put Southern on notice that it needed the Receivables to meet its payroll the next day, and that it would sue Southern for damages incurred if the Receivables were not released.

On August 7, 1998, Worldwide and Southern negotiated an agreement that permitted Commerce to release some of the Receivables by dividing them evenly between Worldwide and Southern. On August 21, 1998, Worldwide failed to meet its payroll, and its employees refused to report to work. On August 24, 1998, Worldwide and Southern negotiated another agreement that permitted Commerce to release additional funds to Southern and Worldwide. However, on August 28 and September 4, respectively, the FBI and Department of Labor each terminated its contract with Worldwide.

In a September 11, 1998 letter, Worldwide again attempted to persuade Southern to release its claims to the Receivables. In that letter, Worldwide demanded that Southern immediately contact Commerce and authorize it to release any funds held in excess of the sums Southern claimed it was owed. Southern apparently refused to comply with that demand. Worldwide's financial problems then escalated and it eventually filed a Chapter 11 bankruptcy petition.

On February 19, 1999, Commerce filed an interpleader action under 28 U.S.C. § 1335 with the United States District Court for the Eastern District of Virginia, Alexandria Division, naming Worldwide, Southern, and the Bank of Asheville as defendants and claimants to the stake. On July 28, 1999, Worldwide answered the complaint and asserted, *inter alia*, cross-claims for tortious interference with con-

tractual relations and tortious interference with prospective economic advantage against Southern. Worldwide, Southern, and the Bank of Asheville each moved for summary judgment claiming ownership of the Receivables. Southern also moved for summary judgment with respect to Worldwide's cross-claims.

On November 30, 1999, the district court granted the Bank of Asheville's motion regarding entitlement to the Receivables and denied those of Worldwide and Southern. The court also granted Southern's motion for summary judgment on Worldwide's cross-claims. As to the tortious interference with contractual relations claim, the court ruled that Southern was privileged or justified "to assert claims on the disputed funds in which it had a legitimate financial interest." (J.A. at 173.) Regarding the prospective economic advantage claim, the court ruled that Worldwide did not "set forth facts which establish that Southern engaged in any intentional misconduct." *Id.* at 174. Worldwide now appeals the district court's rulings.

## II.

We review the district court's grant of summary judgment de novo. *Kubicko v. Ogden Logistics Servs.*, 181 F.3d 544, 551 (4th Cir. 1999). Summary judgment is appropriate only in those cases where the pleadings, affidavits, and responses to discovery "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A material fact is one "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A disputed fact presents a genuine issue "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.*

## III.

In this diversity action, it is undisputed that Worldwide's claims arise under Virginia law. Although under Virginia law the elements of a prima facie case for tortious interference with contractual relations and for tortious interference with prospective economic advantage are generally very similar, they differ in respects material to this

case. We will therefore discuss each claim separately. We turn, first, to Worldwide's claim for tortious interference with contractual relations.

## A.

To make a claim of tortious interference with contractual relations in Virginia a plaintiff must prove the following elements: "(1) the existence of a valid contractual relationship . . .; (2) knowledge of the relationship . . . on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship . . .; and (4) resultant damage to the party whose relationship . . . has been disrupted." *Chaves v. Johnson*, 335 S.E.2d 97, 102 (Va. 1985). An interferor may escape liability, however, by proving that the interference was justified or privileged because the interferor acted for the purpose of protecting its own "financial interest." *Id.* at 103.[4] The burden rests on the interferor to prove that the interference is justified or privileged. *Id.*

To survive summary judgment, Worldwide must demonstrate that a reasonable jury could find that both (a) Worldwide presented a prima facie case, and (b) Southern failed to prove that the interference was justified or privileged on the basis of Southern's financial interest. We will discuss the prima facie elements and the financial interest defense separately. Since the district court based its ruling on Southern's ability to use the financial interest defense, we shall begin our discussion there.

## 1.

The district court ruled that Southern was privileged to assert claims "on the disputed funds in which it had a legitimate financial interest." The court's ruling seems to be grounded in the theory that

---

[4]*Chaves* specifically provided five grounds for the use of the affirmative defense of justification or privilege: "legitimate business competition, financial interest, responsibility for the welfare of another, directing business policy, and the giving of requested advice." *Chaves*, 335 S.E.2d at 103 (citing *Calbom v. Knudtzon*, 396 P.2d 148, 151 (Wash. 1964)).

Southern was legally entitled to assert its financial interest in the Receivables. Worldwide contends, however, that the court's ruling was inconsistent insofar as the court held that while Southern had no legal claim to the Receivables, it was nevertheless privileged or justified in asserting its claims.

We have found no Virginia cases that clearly define the parameters of the financial interest defense. The Virginia courts do, however, refer us to the discussion in the Restatement (Second) of Torts §§ 768-772 (1977) regarding the affirmative defenses applicable to tortious interference claims. *Chaves*, 335 S.E.2d at 103. It is clear that to invoke the defense one must act for the purpose of protecting a financial interest that one actually possesses. *See* Restatement (Second) of Torts § 769 (applying the financial interest defense to "[o]ne who, *having a financial interest*," intentionally interferes with another and a third party's contractual relations) (emphasis added); *see also Zoby v. American Fidelity Co.*, 242 F.2d 76, 79 (4th Cir. 1957) (applying the financial interest defense "[w]here the alleged interferer *is a financially interested party* and such interest motivates his conduct . . . .") (emphasis added). In general, the defense is "based upon the relationships between the parties and the balance to be struck between the social desirability of protecting the business relationship, on one hand, and the interferor's freedom of action on the other." *Chaves*, 335 S.E.2d at 103.

Worldwide argues that Southern could not have been privileged or justified to assert claims to the Receivables because it in fact had no financial interest in them. Southern contends that Denmark transferred to Worldwide the contracts in which Southern had a security interest, and that its liens were still valid following the transfers because it had not consented to them. Federal law clearly prohibits any party to a contract with the United States government from transferring that contract, or any interest therein, to any other party. 41 U.S.C.A. § 15 (West Supp. 2000).[5] If any such transfer is consum-

---

[5]41 U.S.C.A. § 15 (West Supp. 2000) provides that "No contract or order, or any interest therein, shall be transferred by the party to whom such contract or order is given to any other party, and any such transfer shall cause the annulment of the contract or order transferred, so far as the United States is concerned." This statute has not been amended since 1996.

mated, then the transferred contract is annulled so far as the United States is concerned. *Id.*

Here, it is immaterial whether or not the FBI and the Department of Labor assigned the Government Contracts to Worldwide in transactions distinct from the Worldwide-Denmark asset purchase agreement. If this occurred, then Denmark never transferred the Government Contracts to Worldwide, in which case Southern had no reason to assert claims with Commerce, because Denmark's debts to Southern remained with Denmark. If, on the other hand, Denmark transferred some or all of the Government Contracts to Worldwide, as Southern contends, then the obligations to make payments under the Government Contracts were annulled, in which event the Receivables were extinguished entirely. In either event, it was legally impossible for Denmark to transfer the Government Contracts to Worldwide in a manner that preserved Southern's financial interests in the Receivables. For this reason, Southern cannot invoke the financial interest defense.[6]

Southern nevertheless argues that its good faith, albeit mistaken, belief that it possessed an interest in the Receivables is sufficient to prove the financial interest defense. However, this argument misconstrues the requirements of the defense. As is noted above, one must *actually possess a financial interest* in the business of a third person to justify interference with the business relationship of another and the third person. *See* Restatement (Second) of Torts § 779. In this regard, whether or not one acted on the basis of a good faith belief

---

[6]There is another reason Southern cannot argue that it possessed an interest in the Receivables. The district court, in ruling that the Bank of Asheville was entitled to the Receivables, found that Southern's financing agreement with Denmark had no bearing whatsoever on the Bank of Asheville's interests in the accounts receivable of Worldwide. (J.A. at 172.) Because Southern's security interests were filed first in time, if Southern had *any* legal interest in the Receivables, its interests would have taken priority over those of the Bank of Asheville. The court's ruling that the Bank of Asheville was entitled to the funds therefore means that Southern had absolutely no legal claim to them. Southern did not appeal that portion of the district court's ruling. Res judicata principles therefore instruct that Southern cannot now argue that it possessed a legal interest in the Receivables.

is simply irrelevant when it is determined that he or she does not in fact possess a legally protected financial interest.

It is beyond dispute that Southern had absolutely no legal interest whatsoever to protect. Under these circumstances, the balance should be struck in favor of protecting the valid business relationship between Worldwide and Commerce. We therefore conclude that a reasonable jury could find that Southern failed to prove that its actions were justified or privileged on the basis of the financial interest defense.[7]

2.

It is unclear whether the district court found that Worldwide presented a prima facie case for tortious interference with contractual relations in granting summary judgment for Southern. In any event, to survive summary judgment Worldwide must demonstrate that a reasonable jury could conclude that it did. There is no genuine dispute that Worldwide presented evidence sufficient to find that (a) a valid contract existed; (b) Southern knew both of the contract's existence

---

[7]We also note that it is not entirely clear under Virginia law whether the financial interest defense can be invoked *at all* in cases concerning interference with a contract that is not terminable at will. The *Chaves* court, in dealing with such a contract, identified the financial interest defense as one of the applicable affirmative defenses. *See Chaves*, 335 S.E.2d at 102-03. However, the court also rejected the defendant's use of the defense, and in so doing stated that "Some jurisdictions have held that a competitor is justified by economic self-interest in causing a third person not to enter into a prospective business relationship with another competitor, or not to continue an existing contract terminable at will . . . . His conduct is tortious, however, if he induces the third party to breach an existing contract which is *not* terminable at will." *Id.* at 103 (emphasis added) (citations omitted). This language may indicate that the financial interest defense can *never* be used in cases involving contracts not terminable at will. Such a policy would be consistent with the Restatement (Second) of Torts, which provides that the financial interest defense is inapplicable to the causing of a "breach of contract." *See* Restatement (Second) of Torts § 769. Because we find that Southern's attempt to use the financial interest defense on the merits must fail as a matter of law, it is unnecessary for us to resolve the larger ambiguity in Virginia law.

and of the fact that it was interfering with Commerce's performance of the contract; and (c) Worldwide suffered damages as a result. We will therefore focus on the third element of the tortious interference with contractual relations claim - intentional interference inducing or causing a breach or termination of the relationship. This third element speaks to both intent and causation. We first discuss the matter of Southern's intent.

a.

Southern argues that it asserted its claims to the Receivables not for the purpose of interfering with the Worldwide-Commerce relationship, but rather to protect what it in good faith believed were its own legal interests. According to Southern, the intent to protect one's own interests falls short of that required to subject one to liability. Here again, Southern's argument misconstrues the law. Liability certainly attaches where an interferor acts with the purpose of, or a partial desire to, interfere with the performance of another's contract. Tortious interference claims are not, however, restricted to these circumstances. The requisite level of intent also exists if the interferor "knows that the interference is certain or substantially certain to occur as a result of his [or her] actions." Restatement (Second) of Torts § 766 cmt. j.

Here, Southern contacted Commerce directly at least twice in July of 1998 in an effort to persuade Commerce that Southern rather than Worldwide was entitled to the Receivables. The very purpose of those efforts, which were undertaken only six days after Southern learned of the Worldwide-Denmark asset purchase agreement, was to affect the performance of the Worldwide-Commerce contract. In its August 6, 1998 letter, Worldwide then specifically put Southern on notice that Commerce was withholding funds from Worldwide because Southern had staked a claim to those funds. By this time, there can be no dispute that Southern was at least substantially certain that it had interfered with the Worldwide-Commerce contract, and that it would continue to do so if it refused to retract its demand that Commerce pay all or part of the Receivables to Southern. In these circumstances, a reasonable jury could easily conclude that Southern either (a) acted for the purpose of, or with the desire to, cause Commerce to withhold the Receivables from Worldwide; or (b) knew the subse-

quent withholding of the Receivables from Worldwide was substantially certain to occur.

### b.

Regarding the causation portion of the third element, Worldwide maintains that but for Southern's interference, Worldwide would not have failed to meet its payroll, its employees would not have failed to report to work, and Worldwide would not, therefore, have lost the Government Contracts. In light of the district court's ruling that the Bank of Asheville stood in front of Worldwide and was entitled to the Receivables, it is not entirely clear why Worldwide expected to obtain the Receivables immediately from Commerce. However, the factual record before us is insufficient to resolve that issue. What is clear is that Worldwide has otherwise easily demonstrated evidence sufficient to show that Southern actually caused Commerce to withhold the Receivables, and that the withholding of those funds was, at the very least, a substantial factor in Worldwide's loss of the Government Contracts.

In light of the foregoing analysis regarding the intent and causation portions of the third element, we conclude that a reasonable jury could find that Worldwide presented a prima facie case for tortious interference with contractual relations. We now discuss the district court's grant of summary judgment on Worldwide's claim for tortious interference with prospective economic advantage.

### B.

As we noted above, under Virginia law the elements required to establish tortious interference with prospective economic advantage are quite similar to those required to establish tortious interference with contractual relations. In general, a claimant must: (1) demonstrate the existence of a business relationship or expectancy, with a probability of future economic benefit; (2) prove knowledge of the relationship or expectancy; (3) show that it was reasonably certain that absent intentional misconduct, the claimant would have continued in the relationship or realized the expectancy; and (4) show that it suffered damages from the interference. *Levine v. McLeskey*, 881 F.Supp. 1030, 1057 (E.D. Va. 1995), *aff'd in part, vacated in part,*

*and remanded*, 164 F.3d 210, 211 (4th Cir. 1998) (citing *Glass v. Glass*, 321 S.E.2d 69, 77 (Va. 1984)).

There is one critical difference, however, between a prospective economic advantage and a contractual relations claim in Virginia. In the prospective economic advantage context a plaintiff must also demonstrate that the defendant employed "improper methods." *See Maximus, Inc. v. Lockheed Info. Sys., Inc.*, 493 S.E.2d 375, 378-379 (Va. 1997); *see also Duggin v. Adams*, 360 S.E.2d 832, 836 (Va. 1987). In *Duggin v. Adams*, 360 S.E.2d 832 (Va. 1987), the Virginia Supreme Court identified methods of interference that are considered "improper." Among the most egregious examples of improper conduct are those "that are illegal or independently tortious, such as violations of statutes, regulations, or recognized common-law rules." *Duggin*, 360 S.E.2d at 836 (citation omitted). Other egregious forms of interference "include violence, threats or intimidation, bribery, unfounded litigation, fraud, misrepresentation or deceit, defamation, duress, undue influence, misuse of insider or confidential information, or breach of a fiduciary relationship." *Id.* Less egregious improper methods include violations of "an established standard of a trade or profession . . ., unethical conduct . . ., sharp dealing, overreaching, or unfair competition . . . ." *Id.* at 837.[8]

Worldwide argues that Southern's conduct constitutes the type of "improper conduct" necessary to make a prima facie case under Virginia law because it was "unethical." We disagree. Worldwide has not presented evidence of any allegedly "improper" conduct other than Southern's assertion of claims to funds in which it had no legal interest. In pursuing its claims to the Receivables, Southern proceeded solely on the basis of a good faith belief that it had a legally protected interest in the Receivables. Indeed, Worldwide concedes in its brief that "Southern believed itself to be, as a secured creditor of Denmark,

---

[8]Southern argues that improper conduct only includes that which is illegal or independently tortious. However, the Virginia Supreme Court made it clear in *Maximus* that this is not the case. *See Maximus*, 493 S.E.2d at 379 (stating that "[w]hile we have identified actions as improper which were also independently tortious or illegal, . . . we have also identified actions as improper which are not themselves tortious or illegal, such as unfair competition or unethical conduct.").

entitled to the funds Worldwide earned performing U.S. Government contracts." Appellant's Br. at 11. Moreover, Southern detailed in its brief many of the reasons it believed itself to be entitled to the Receivables, including that (a) Southern's financing statements were filed first in time; (b) Southern did not consent to the transfer or assignment of Denmark's contracts with the federal government; (c) the Bank of Asheville's financing statement contained at least one defect; and (d) Southern was unaware of the federal law prohibiting the transfer of contracts with the federal government.

Under these circumstances, Southern's conduct does not rise to the level of "improper conduct" contemplated by Virginia law. Although Southern's actions were unwise, its conduct was not "unethical," and it certainly did not rise to the level of any of the more egregious forms of improper conduct identified in Virginia law. The district court therefore correctly granted summary judgment to Southern on Worldwide's claim for tortious interference with prospective economic advantage.

IV.

In summary, we conclude that Southern's interference with the Worldwide-Commerce relationship was not justified or privileged, and further that Worldwide presented evidence sufficient to proceed on its tortious interference with contractual relations claim. We also conclude that because Southern did not engage in any "improper conduct," Worldwide has failed to present genuine issues of fact that would allow it to proceed on its tortious interference with prospective economic advantage claim. Accordingly, the judgment of the district court is affirmed in part, vacated in part, and remanded for further proceedings not inconsistent with this opinion.

*AFFIRMED IN PART, VACATED*

*PART, AND REMANDED*