UNPUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

COMMERCE FUNDING CORPORATION,
                              *Plaintiff,*

            v.

WORLDWIDE SECURITY SERVICES
CORPORATION,
                  *Defendant-Appellant,*

            v.                              No. 02-1977

SOUTHERN FINANCIAL BANK,
                  *Defendant-Appellee,*

            and

BANK OF ASHEVILLE,
                              *Defendant.*

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Claude M. Hilton, Chief District Judge.
(CA-99-201-A)

Argued: May 9, 2003

Decided: October 28, 2003

Before TRAXLER, KING, and GREGORY, Circuit Judges.

---

Affirmed by unpublished per curiam opinion.

---

## COUNSEL

**ARGUED:** William Michael Holm, WOMBLE, CARLYLE, SAND-
RIDGE & RICE, P.L.L.C., McLean, Virginia, for Appellant. Thomas

Patrick Gorman, TYLER, BARTL, GORMAN & RAMSDELL, P.L.C., Alexandria, Virginia, for Appellee. **ON BRIEF:** Jerry W. Boykin, WOMBLE, CARLYLE, SANDRIDGE & RICE, P.L.L.C., McLean, Virginia, for Appellant. Steven B. Ramsdell, TYLER, BARTL, GORMAN & RAMSDELL, P.L.C., Alexandria, Virginia, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

**OPINION**

PER CURIAM:

In a previous appeal, we concluded that Worldwide Security Services Corporation ("Worldwide Security") had presented sufficient evidence to survive a motion for summary judgment filed by Southern Financial Bank ("Southern Financial") on Worldwide Security's claim for tortious interference with contractual relations, and we remanded so that Worldwide Security could continue to pursue its claim. *See Commerce Funding Corp. v. Worldwide Sec. Servs. Corp.*, 249 F.3d 204, 214-15 (4th Cir. 2001). On remand, the district court conducted a bench trial and entered judgment for Southern Financial on that claim. Worldwide Security appeals. For the reasons stated below, we affirm.

I.

Although *Commerce Funding* contains a thorough recitation of the underlying facts, we must consider Worldwide Security's appeal in light of the evidence developed at trial rather than the summary judgment record that was previously before us. *See Distaff, Inc. v. Springfield Contracting Corp.*, 984 F.2d 108, 111 n.1 (4th Cir. 1993) ("[S]ummary judgment is usually made before trial and decided on documentary evidence, while directed verdicts are made at trial and decided on the evidence that has been admitted." (internal quotation

marks omitted)); *cf. Thorpe v. Mutual of Omaha Ins. Co.*, 984 F.2d 541, 545 (1st Cir. 1993) ("Evidence adduced at trial will almost always differ in degree, force, and quantity from that submitted on a motion for summary judgment."). Of course, in the present appeal, we need only review the facts relating to Worldwide Security's single claim of tortious interference with contractual relations.

Between 1996 and 1997, the United States Department of Labor and the Federal Bureau of Investigation ("FBI") awarded Denmark Security, Inc. ("Denmark") several contracts to provide security guard services (the "government contracts"). Denmark was in need of working capital and Southern Financial agreed to extend a Small Business Administration ("SBA") loan of $80,000 to Denmark in return for a security interest in various assets held by Denmark, including the accounts receivable generated by its government contracts. Southern Financial did not, however, take a security interest in Denmark's "contract rights." J.A. 605, 612. Southern Financial properly perfected its security interest.

By March 1998, Denmark was struggling financially and began discussing the possibility of the acquisition of Denmark by Worldwide Security. On March 21, 1998, Vincent Venegoni, Worldwide Security's principal, signed a "Stock Purchase Agreement" with Dennis and Lisa Haas, Denmark's sole shareholders, whereby Venegoni agreed to pay $100,000 in exchange for all outstanding shares of Denmark stock. On April 10, 1998, Dennis Haas and Venegoni informed Michelle Douglas, a loan officer for Southern Financial, that they were contemplating the potential purchase of Denmark by Worldwide Security. Douglas informed Venegoni that Southern Financial would be willing to allow Worldwide Security to assume Denmark's loan if it submitted, and Southern Financial approved, an application for the loan.

Ultimately, Venegoni and Worldwide Security decided not to close on the stock purchase agreement after reviewing Denmark's financial information, which included Southern Financial's security interest in the accounts receivable generated from Denmark's government contracts. On April 20, 1998, Venegoni sent written notice to Worldwide Security's own lender, the Bank of Asheville, that there would be no stock purchase. However, until May 28, 1998, Worldwide Security

continued to represent to Denmark that it was willing to complete the stock purchase.

On April 21, 1998, still in need of working capital to meet payroll and other obligations, Denmark entered into a factoring agreement with Commerce Funding Corporation ("Commerce"). Under this factoring agreement, Commerce contracted to advance funds on the receivables from Denmark's government contracts in exchange for a security interest in and the assignment of Denmark's accounts receivable. Venegoni signed the factoring agreement on behalf of Denmark even though the stock purchase was never consummated.

On May 5, 1998, Commerce and Southern Financial entered into an "Intercreditor Agreement" under which Southern Financial agreed to subordinate its security interest to Commerce's security interest in the receivables from Denmark's government contracts. Denmark, as the debtor, was also party to the Intercreditor Agreement; Venegoni signed on behalf of Denmark as Chairman of the Board of Directors.

On May 28, 1998, well after Southern Financial had agreed to subordinate its security interest to Commerce, Venegoni notified Denmark that he no longer intended to finalize the purchase of Denmark stock as a result of what he believed were financial misrepresentations by Denmark. Instead, on July 4, 1998, Worldwide Security entered an agreement with Dennis and Linda Haas to purchase the corporate assets of Denmark, including "all contracts" and "all receivable[s] and any other moneys . . . due to" Denmark. J.A. 342-43. The asset purchase agreement indicated that Denmark's assets were "free and clear of all pledges, liens, security interests, or other encumbrances of any kind whatsoever." J.A. 343.

The asset purchase agreement included an addendum clarifying that the receivables generated from Denmark's government contracts had been "pledged" to Commerce "for a period of one year under a factoring agreement dated April 1998." J.A. 350. Thus, except as specified in the addendum, Denmark "represent[ed] and warrant[ed] that [it had] not pledged any of [the] Assets being conveyed and [had] not executed any instruments evidencing or relating to indebtedness for borrowing money pursuant to which the business assets are obligated." J.A. 344. As part of its consideration, Worldwide Security

promised to employ Haas. Venegoni signed on behalf of Worldwide Security as its president even though he was clearly aware that Southern Financial had extended an SBA loan to Denmark and held an interest in the receivables to the government contracts, given that he had signed the Intercreditor Agreement on behalf of Denmark.

Although the parties closed on the asset purchase agreement on June 12, 1998, Worldwide Security later issued invoices seeking to collect for services rendered by Denmark prior to the closing date. Southern Financial received notice that Worldwide Security had acquired Denmark's assets rather than full ownership of the company, but Worldwide Security nevertheless continued to represent that it intended to satisfy Denmark's debt obligation to Southern Financial, which still held a security interest in Denmark's receivables.

Worldwide Security, meanwhile, obtained financing of its own. First, on May 4, 1998, Worldwide Security obtained a loan from the Bank of Asheville, which took a security interest in Worldwide Security's "contract rights." Second, on June 30, 1998, after having acquired and begun servicing Denmark's government contracts, Worldwide Security entered into a factoring agreement with Commerce, as had Denmark. Commerce agreed to finance Worldwide Security's receivables, easing cash flow so that Worldwide Security could meet payroll. In exchange, Commerce took and perfected a security interest "in all of [Worldwide Security's] assets either now owned or hereafter acquired . . . including . . . accounts receivable . . . [and] contract rights." J.A. 356. Venegoni signed on behalf of Worldwide Security, just as he signed on behalf of Denmark in its factoring agreement with Commerce, but he did not inform Southern Financial of the contract.

By the end of July 1998, Southern Financial's loan to Denmark was in default. Southern Financial sent a notice of default to Dennis Haas, accelerated the outstanding loan balance of $72,337.33, and demanded immediate payment from Denmark. When the loan remained in default, Southern Financial began efforts to recoup its money through Denmark's assets in which Southern Financial held a security interest, including Denmark's accounts receivable. On July 21, 1998, pursuant to the Intercreditor Agreement it had entered with Commerce and Denmark, Southern Financial notified Commerce that

"[a]s the secondary lien holder . . . we are requesting at this time that any excess paid funds from the receivables assigned to you be sent directly to . . . Southern Financial." J.A. 362. A few days later, counsel for Southern Financial notified Commerce that Southern Financial had learned about Worldwide Security's purported purchase of Denmark's assets and that it had not approved the transfer of Denmark's collateral, as was Southern Financial's right to do under the terms of its security agreement with Denmark. Southern Financial asserted that it was entitled to any funds collected on the government contracts in excess of those due Commerce, as provided by the Intercreditor Agreement.

Worldwide Security responded that, pursuant to the asset purchase agreement with Denmark, it owned Denmark's contract rights, including the government contracts, and, necessarily, the receivables flowing from the government contracts then being serviced by Worldwide Security. Worldwide Security based its position on the fact that Southern Financial held its security interest only in Denmark's accounts receivable, not its contract rights. Thus, Worldwide Security took the position that Southern Financial was attempting to collect *Worldwide*'s receivables, in which it held no security interest.

As a result of this dispute, Commerce placed a hold on any advances of funds it collected from the government contracts over and above that which Commerce was entitled to under its factoring agreement with Worldwide Security. Although Commerce, Southern Financial, and Worldwide Security agreed to the disbursement of some funds in mid-August 1998 so that Worldwide Security could meet payroll obligations, Commerce retained the remainder of the receivables until the dispute could be resolved. Despite the disbursement of funds, Worldwide Security failed to meet payroll and its employees walked off of the job on August 21. Worldwide Security subsequently lost the government contracts.

In February 1999, Worldwide Security filed a bankruptcy petition seeking to reorganize under Chapter 11 of the Bankruptcy Code. Its attempt at reorganization ultimately failed, and the petition was converted to a Chapter 7 liquidation.

Commerce filed this interpleader action under 28 U.S.C. § 1335 against Worldwide Security, Southern Financial, and the Bank of

Asheville as claimants to the receivables held by Commerce. Worldwide Security asserted cross-claims against Southern Financial for tortious interference with contractual relations and tortious interference with prospective economic advantage. On the claim for tortious interference with contractual relations, Worldwide Security alleged that Southern Financial's demand for the receivables generated by the government contracts caused Commerce to breach its factoring agreement with Worldwide Security by freezing disbursements of funds collected under the government contracts.

All of the parties moved for summary judgment as to the receivables; the district court determined that the Bank of Asheville was entitled to the receivables being held by Commerce and granted summary judgment in its favor. The district court also granted summary judgment to Southern Financial on both of Worldwide Security's cross-claims. On the tortious interference with contractual relations claim, the district court concluded that Southern Financial "was privileged or justified to assert claims on the disputed funds in which it had a legitimate financial interest." *Commerce Funding*, 249 F.3d at 209 (internal quotation marks omitted).

On appeal, we vacated the district court's ruling. *See id.* at 214-15. We held that "a reasonable jury could find that Southern [Financial] failed to prove that its actions were justified or privileged on the basis of the financial interest [affirmative] defense." *Id.* at 212. This holding rested on our conclusion that, under Virginia law, in order to establish the affirmative defense of justification, the party that is interfering "must *actually possess a financial interest*" in the matter, not merely have a "good faith belief" that it has a financial interest in need of protection. *Id.* at 211-12. We also concluded that Worldwide Financial presented sufficient evidence on each element of the tortious interference claim to survive summary judgment. *See id.* at 212-13.

On remand, after conducting a bench trial, the district court entered judgment in favor of Southern Financial. The court explained that "[w]hile the Fourth Circuit held that Worldwide provided sufficient evidence to create a triable issue of fact with respect to the four elements of its prima facie case, Worldwide failed to do so at trial." J.A. 733. Specifically, the court found that "Worldwide failed to prove that

[Southern Financial] had knowledge of Worldwide's factoring agreement with Commerce Funding, that [Southern Financial] intentionally interfered in such contract causing its breach, or that [Southern Financial] attempted to interfere with the agreement." J.A. 733. Also, the district court concluded that Worldwide Security failed to offer sufficient proof of any damages relating to Southern Financial's conduct.

Worldwide Security appeals for a second time, raising essentially two challenges to the district court's decision. First, Worldwide Security argues that the court erroneously applied Virginia law to the evidence at trial in concluding that Worldwide Security failed to establish the elements of its claim. Second, Worldwide Security argues that the district court applied the wrong legal standard in rejecting its claim for lost profits and other damages, and then ignored its damages evidence which was sufficient to support an award of damages, including lost profits.

## II.

In an appeal following a bench trial, our review of the district court's legal conclusions is de novo, but we will not disturb the court's factual findings unless they are clearly erroneous. *See Williams v. Sandman*, 187 F.3d 379, 381 (4th Cir. 1999). A district court's factual finding is clearly erroneous "when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Scrimgeour v. I.R.S.*, 149 F.3d 318, 324 (4th Cir. 1998) (internal quotation marks omitted). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Id.* (internal quotation marks and alteration omitted).

## A.

To prevail on its cause of action arising under Virginia law, Worldwide Security was required to prove: "(1) the existence of a valid contractual relationship . . . ; (2) knowledge of the relationship . . . on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship . . . ; and (4) resultant damage to the party whose relationship . . . has been disrupted." *Chaves*

*v. Johnson*, 335 S.E.2d 97, 102 (Va. 1985). Worldwide Security bore the burden of convincing the district judge, sitting as the trier of fact, that each element was present. It is undisputed that, as required by the first element, a valid contract existed between Worldwide Security and Commerce in the form of the factoring agreement. Therefore, we turn to the other elements.

First, Worldwide Security was required to demonstrate "knowledge of the relationship . . . on the part of the interferor." *Id.* at 102. The interferor "must have knowledge of the contract with which he is interfering and of the fact that he is interfering with the performance of the contract." Restatement (Second) of Torts § 766, comment i. The district court concluded, based on its view of the evidence, that Worldwide Security failed to carry its burden of "prov[ing] that [Southern Financial] had knowledge of Worldwide's factoring agreement with Commerce Funding." J.A. 733. The district court explained that "[n]o evidence was presented that Worldwide ever informed [Southern Financial] of the factoring agreement it entered into with Commerce Funding" and that "when [Southern Financial] wrote Commerce Funding in late July 1998 demanding Denmark's receivables in excess of the amounts Denmark owed to Commerce Funding, [Southern Financial] was acting pursuant to . . . its own Inter-creditor Agreement with Commerce Funding and without knowledge of the factoring agreement." J.A. 733.

Worldwide Security argues that the district court erred in concluding that Southern Financial did not have knowledge of the contractual relationship because the Southern Financial loan officer responsible for the loan to Denmark, Michelle Douglas, testified that she was aware of a contractual arrangement between Commerce and Worldwide Security by the end of July 1998. Worldwide Security also points to a letter, dated August 6, from its attorney to Southern Financial's attorney, in which a reference is made to "Worldwide [having] granted a security interest to [Commerce] in its receivables." J.A. 369.

Although Worldwide Security is correct that this evidence is sufficient to *permit* the trier of fact to conclude that the knowledge requirement has been satisfied, it does not *require* such a conclusion. Worldwide Security, in effect, is advancing a summary judgment argument — indeed, we previously concluded that there was suffi-

cient evidence, when viewed in the light most favorable to Worldwide Security, to permit a trier of fact to find in its favor on the elements of a tortious interference claim. *See Commerce Funding*, 249 F.3d at 212-13. On remand, however, the issue was no longer whether Worldwide Security could offer sufficient evidence to establish each element; rather, the question was whether it could prove its claim by a preponderance of the evidence to the district court.

Worldwide Security's only argument in this regard is that the district court should have been persuaded that Southern Financial knew about the contract by Douglas's testimony and the letter to Southern Financial's attorney, which is really nothing more than a challenge to the district court's contrary *factual determination*. The district court's conclusion that Southern Financial was not aware of the factoring agreement between Worldwide Security and Commerce is supported by the evidence. As noted by the court, there was no evidence that either Worldwide Security or Venegoni informed Southern Financial of the factoring agreement or its terms or provided a copy of it. John Geraerdts, who served as counsel for Commerce, testified that Southern Financial was not a party to the arrangement between Worldwide Security and Commerce and that there was "no reason for them to even know about that loan." J.A. 165. This testimony was consistent with Worldwide Security's position before and throughout the litigation that unlike the factoring agreement between Denmark and Commerce, which required Southern Financial's participation because of its interest in Denmark's receivables, the factoring agreement between Worldwide Security and Commerce asserted a lien in receivables ostensibly generated from contracts owned by *Worldwide Security*. Moreover, as noted by the court, Southern Financial made its demands for the receivables generated from Denmark's government contracts pursuant to its contract with Commerce under the Intercreditor Agreement, without referring to any arrangement Commerce had with Worldwide Security.

Although Douglas testified that she knew of a contractual arrangement between Worldwide Security and Commerce, she indicated that her knowledge resulted from an exchange of letters at the end of July. Specifically, Douglas was referring to a July 21 letter to Commerce in which she made a demand under the terms of the Intercreditor Agreement and a July 24 letter drafted by Southern Financial's attor-

ney also seeking to recoup receivables under the Intercreditor Agreement. Neither letter made any reference whatsoever to a contractual arrangement between Worldwide Security and Commerce; in fact, the only "new" information that "ha[d] come to [Southern Financial's] attention [was] that Mr. Haas has sold the assets of his business . . . to Worldwide Security." J.A. 363. Therefore, Douglas's testimony was far from conclusive regarding Southern Financial's knowledge of the contract. Since there was other evidence suggesting that Southern Financial was unaware of the contract, the district court's conclusion did not amount to clear error. *See Scrimgeour*, 149 F.3d at 324 ("[T]he fact-finder's choice . . . cannot be clearly erroneous" if "there are two permissible views of the evidence." (internal quotation marks omitted)).

## B.

Next, Worldwide Security challenges the district court's conclusion that it failed to prove the third element of the tort — "intentional interference inducing or causing a breach or termination" of the contract. *Commerce Funding*, 249 F.3d at 210 (internal quotation marks omitted). The intent requirement may be satisfied not only when the defendant "acts for the primary purpose of interfering with the performance of the contract," but also when the defendant "knows that the interference is certain or substantially certain to occur as a result of his [or her] actions." Restatement (Second) of Torts § 766 cmt. j; *see Commerce Funding*, 249 F.3d at 212-13. The district court concluded that the evidence showed only that Southern Financial was "attempting to enforce its own rights under its various agreements, including the Intercreditor Agreement when it attempted to take hold of the funds," rather than attempting to interfere with the contract between Worldwide Security and Commerce. J.A. 734. Moreover, given the court's finding that Worldwide Security failed to prove the knowledge requirement, the evidence would necessarily fail to show that Southern Financial knew that interference was certain or substantially certain to occur as a result of its attempt to exercise its rights under the Intercreditor Agreement.

Worldwide Security argues that the district court's conclusion contravenes our holding in the previous appeal that rejected Southern Financial's affirmative defense that any interference was justified by

its "financial interest" because "Southern had absolutely no legal interest whatsoever to protect." *Commerce Funding*, 249 F.3d at 212. We explained that in the absence of an actual financial interest, the defendant may not assert an affirmative defense arguing that interference was justified or privileged. Thus, even if the actor possesses a good faith belief that he has such an interest in the matter, it is no defense if he does not *actually* possess such an interest. *See id.* at 212. Worldwide Security contends that the district court ignored our decision to the extent that the court relied on evidence that Southern Financial was protecting its own financial interest under the Intercreditor Agreement. Thus, Worldwide Security argues that the only factual question for trial was whether Southern Financial's actions in fact interfered with the contract.

Worldwide Security misconstrues our prior decision. In *Commerce Funding* we held that good faith, or lack thereof, is not relevant for purposes of the "financial interest" *affirmative defense*. An affirmative defense serves as a "bar to the right of recovery even if the general complaint were more or less admitted to." *Emergency One, Inc. v. American Fire Eagle Engine Co.*, 332 F.3d 264, 271 (4th Cir. 2003) (internal quotation marks omitted). Therefore, the financial interest affirmative defense can shield from liability a defendant who is *otherwise guilty* of intentional interference with a contract. *Commerce Funding* simply established that a defendant may not intentionally interfere with a contract and then justify his actions by proving that he reasonably, albeit mistakenly, believed he was protecting a legal interest to which he was entitled. *See* 249 F.3d at 210-12. Such a defense, of course, assumes that the defendant has otherwise tortiously interfered with the contract — *i.e.*, that the defendant knew about the contract and knew that his actions were "certain or substantially certain" to interfere with the contract. *Id.* at 212-13 (internal quotation marks omitted). By contrast, the decision of the district court focused not on an affirmative defense but on Worldwide Security's proof of the elements of its claim. Southern Financial's pursuit of Denmark's receivables under the Intercreditor Agreement was relevant to knowledge of the contract as well as intent and purpose — elements that Worldwide Security was required to prove in order for

the district court to find that Southern Financial was "otherwise guilty" of tortious interference.*

### III.

Because we affirm the district court's conclusion that Worldwide Security failed to prove Southern Financial's knowledge of or intentional interference with the contract, we need not consider whether Worldwide Security offered sufficient evidence to support its claim for lost profits or other damages. Accordingly, we affirm the judgment of the district court.

*AFFIRMED*

---

*In making this argument, Worldwide Security again fails to distinguish between summary judgment and a bench trial. In *Commerce Funding*, we were reviewing the district court's disposition of a summary judgment motion. We concluded that, construing the facts in favor of Worldwide Security, Southern Financial was not entitled to summary judgment based on a financial interest affirmative defense because "a reasonable jury *could* find that Southern failed to prove that its actions were justified or privileged on the basis of [its] financial interest." *Commerce Funding*, 249 F.3d at 212 (emphasis added). The earlier denial of a summary judgment motion, of course, does not preclude the ultimate entry of judgment in favor of the party to whom summary judgment was denied. *See Thorpe*, 984 F.2d at 545.